Joe Pinkerton, also known as Joseph Allen Pinkerton, was convicted on one count of the sale of cocaine, § 20-2-70 (a), Code of Alabama 1975, and punishment was fixed by the jury at a $12,500.00 fine, to which was added a fifteen year term of imprisonment by the trial court. Pinkerton does not on this appeal challenge the sufficiency of the evidence upon which he was convicted, nor did he do so at the trial level by either motion to exclude the State's evidence, request for the affirmative charge, or by motion for a new trial; hence, we find only a brief statement of the underlying facts to be necessary.
It appears from the evidence presented by the State that, on the night of October 7, 1979, one David Vickers, an informer, and Jay Ivey, an undercover agent with the Alabama Alcoholic Beverage Control Board, contacted the appellant by telephone about purchasing some cocaine, and agreed to meet him at a designated time in the parking lot of a store. At the appointed time, appellant and a second man, identified as an Edward Watts, drove into the parking lot in appellant's car, and Watts left the car and entered the store. Vickers then approached appellant, who was still seated in his car, engaged in some conversation with him, and received a small package from him, which he then returned to Ivey, who was waiting in his own car some distance away. Ivey examined the package, which contained a white powder, later identified to be cocaine, and then accompanied Vickers back over to appellant's car, at which point Watts emerged from the store and re-entered appellant's car. Appellant then quoted Ivey a price of $100.00 for the small package, and agreed to sell Ivey a second package for the same price. Ivey then paid appellant, who gave the money to Watts to count. Appellant further agreed that he could probably supply Ivey in the future.
Subsequently, on October 12, 1979, Ivey, Vickers, and A.B.C. Agent Larry Payne contacted appellant a second time by telephone. On this occasion, however, Vickers, who made the call, consented to the request of the officers that the telephone call be recorded, and thus Ivey recorded the subsequent conversation between the appellant and Vickers concerning further sales of cocaine. With this information, Ivey and Payne secured a warrant for the search of appellant's residence. *Page 1082 
Appellant denied that he had talked to Vickers concerning the sale of cocaine, and denied that the voice on the recording, which was admitted into evidence, was his. He further testified that, though he had been present at the store on the night of October 7, his companion, Watts, had been doing any selling of drugs that had occurred, and that he (Pinkerton) did not realize what was going on, although he admitted handing the packages to Ivey.
 I
The sole contention of the appellant is that he was "deprived of his Sixth Amendment right to effective assistance of counsel and his Fifth Amendment due process right to a fair trial" (Brief of Appellant at 39) because his trial counsel[1] had represented the informer, David Vickers, in previous criminal proceedings involving Vickers, thereby creating an actual conflict of interest. It appears that, at some time prior to appellant's arrest on the instant charge of selling cocaine, David Vickers and his wife had been arrested and charged with two counts of selling phencyclidine (PCP), and Vickers had retained the attorney that was to represent appellant (it is not clear whether this attorney also represented Vickers's spouse). During the course of this representation and apparently after some type of discussion with his attorney, Vickers decided to plead guilty to the charges and cooperate with the authorities as an informer in exchange for a recommendation of reduced sentences for himself and his wife. Vickers's subsequent activities as an informer led directly to the arrest of appellant, at which point Vickers's attorney withdrew as his counsel in order to represent appellant. It further appears that neither Vickers nor his wife had been sentenced at the time of appellant's trial, and that in some measure any recommendation as to their sentences was to be based upon the success of Vickers's informer activities. This scenario was developed somewhat at appellant's trial, and we therefore find it necessary to quote at length from the transcript of those proceedings:
"Q. Carol. Now, Mr. Vickers, it was by coincidence I was representing you prior to your becoming involved in this matter; is that correct?
"A. Yes, sir.
* * * * * *
"Q. You tell the jury that I advised you to cooperate with the police?
"A. Yes, sir.
"Q. Isn't the truth of the matter is that was up to you?
"A. Yes, sir.
"Q. Didn't we discuss it?
"A. Yes, sir.
"Q. Were my words to you in substance, `That's awfully dangerous and that you would have to make that decision?'
"A. No, sir.
"Q. Huh?
"A. No, sir.
"Q. What did I tell you?
"A. You told me I already started with 'em I might as well go along with 'em.
"Q. So then you would have already taken part in this before you talked to me: isn't that correct?
"A. No, sir. No, sir.
"Q. Well, say it again, what you said. That you'd already started and I told you you might as well go along with it?
"A. Yes, sir. Remember when I come to your office once and talked to you about it?
"Q. All right. At that point had you already talked to the agents? The narc agent.
"A. No, sir.
"Q. Well, if I said you had already started it and you might as well go along, what was I talking about?
"A. Just talking about cooperating with 'em. I was gonna go into the hospital as an in-patient at Southland Hospital. *Page 1083 
"Q. But what did . . . what did you tell me for me to say since you have already started it you might as well go along with it.
"A. I told you I was mixed up, I didn't know what to do, I didn't know which way to turn. And you told me I might as well go along with it.
"Q. Go along with what, sir?
"A. What they told us over there on that day we walked to the police station. You and my dad, and Larry, and a couple of other officers.
"Q. All right. Well, let's get the sequence of events straightened out. When did you even first think about cooperating with the narcotics agents?
"A. I never thought about it.
"Q. You never thought about it; but yet here you are today.
"A. They approached me.
"Q. All right. They approached you. When was this?
"A. The first time I got . . . the first time they arrested me.
"Q. Well, when was that, sir?
"A. It was March or April 2nd, I believe.
"Q. April of this . . . of 1979?
"A. Yes, sir; when I got busted.
"Q. And you haven't received your sentence yet?
"A. No, sir.
"Q. Has your wife received her sentence yet?
"A. No, sir.
"Q. Her case is before Judge Hocklander, is that correct?
"A. Yes, sir.
"Q. And what Judge is your Judge?
"A. Sweeney.
"Q. Judge Sweeney?
"A. Yes, sir.
"Q. All right. And the State keeps requesting that your case and your wife's case be passed; isn't that correct?
"A. Yes, sir.
"Q. All right. After this got started, did you try to get out of this cooperation with the police?
"A. Yes, sir.
"Q. You were thinking about it. Did they approach you and tell you what would happen to you if you refused to cooperate?
"A. No, sir.
"Q. Well, why did you not stop cooperating? And then what made you want to start cooperating, Mr. Vickers?
"A. When I first started doing it, trying to do it, I kept . . . there wasn't nobody going along with me, and I didn't know what to do.
"Q. They kept putting pressure on you; didn't they? You weren't producing. . . .
"MR. COPELAND: Wait just one second. Judge, he asked the question, why did you decide not to do it and then why did you want to go back and do it. And he hasn't finished explaining the answer yet, if Your Honor please.
"THE COURT: Did you finish your answer?
"A. No, sir.
"THE COURT: Let him finish his answer.
"A. I started trying to cooperate with 'em. I didn't know that many people in this area. So, I just said I'd blow it off and I went into the hospital at Southland. So after I got all the drugs out of me that I had in me; and I decided that I had to do something if I didn't want to go to jail. And this is the first time . . . I don't want to go to jail; and if that's what I have to do that's what I have to do. I don't want my wife to go to jail.
"Q. Did you attempt to set up some buys with other people?
"A. Yes, sir.
"Q. And were those attempts failures or . . .
"A. They was all good attempts.
"Q. Sir?
"A. They was all good attempts. *Page 1084 
"Q. Well, how many other people have you set up?
"A. I don't know. All together I don't know.
"Q. Did the narcotics agents ever tell you you didn't do enough?
"A. No, sir.
"Q. Well, how many other cases did you go on, son?
"A. I've went on several, but I've never counted 'em.
"Q. Well, a hundred?
"A. No, not that many.
"Q. Thirty?
"A. Thirteen, maybe; fifteen.
"Q. Thirteen or fifteen of various people?
"A. Yes, sir.
"Q. How many times have you testified?
"A. This is the first time.
"Q. Well, didn't they tell you you didn't do enough, son? Isn't that what you told me one time?
"A. No, sir, I ain't told you that.
"Q. They wasn't satisfied with what you did, with your attempts? Do you recall that?
"A. No, sir.
"Q. All right. After Mr. Pinkerton's case came about, after he was arrested, is that the first time I found out that you were involved with Mr. Pinkerton?
"A. Yes, sir.
"Q. All right. And I explained to you that I knew Mr. Pinkerton's family for many, many years, and I could not represent both of you.
"A. Yes, sir.
"Q. Isn't that correct? So I had to withdraw from your case; isn't that correct?
"A. Yes, sir.
"Q. And we withdrew friendly, didn't we?
"A. Yes, sir.
"Q. All right. And prior to this time you never told me you were going to try to set Mr. Pinkerton up; is that correct?
"A. I couldn't reveal to you who I was gonna set up.
"Q. In fact you never told me anybody you ever set up or tried to.
"A. I couldn't.
* * * * * *
"Q. All right. Now, when you went to the narcotics agents they asked you to cooperate with 'em. Exactly what did they tell you they would do for you?
"A. They told me they would make a recommendation.
"Q. Of what?
"A. Whatever their recommendation would be.
"Q. Well, they didn't tell you what their recommendation — were they going to recommend that you go to the penitentiary for fifteen years?
"A. They told me they weren't going to recommend — they wasn't gonna make me no promises. They said it would be left up to the Judge, but they would make a recommendation to the Judge, of some kind of probation or whatever . . .
"Q. All right. Let's get . . .
"MR. COPELAND: Let him finish his answer, Delano.
"Q. They said they would not make a recommendation but yet they . . .
"A. They said they would not make no promises.
"Q. Would not make no promises?
"A. No promises.
"Q. But what did they say they would ask the Judge?
"A. They said they would make a recommendation to the Judge according to how much work I done for 'em, or whatever.
"Q. All right. Now, what did you understand for the `how much work' to mean?
"A. I didn't really know, Mr. Palughi. They never set an amount, or a certain number, or how many people. *Page 1085 
"Q. Well, did you understand it to mean how successful you were on them being able to charge other people for these type offenses?
"A. I don't understand your question.
"Q. You knew it didn't mean that you were going to cut their yard, or anything like that, didn't you?
"A. Oh, I knew that."
(R. 64-71)
The argument advanced by appellant that his trial counsel was laboring under a conflict of interest during his representation of appellant raises "(a) grave and important matter . . . that must have our attention as it strikes at the very heart of our criminal justice system and involves fundamental fairness and a keen sense of justice." Satterwhite v. State, Ala.Cr.App.,359 So.2d 816, remanded, Ala., 359 So.2d 819 (1977). It is, of course, a basic constitutional precept that persons subjected to "criminal prosecutions," as that term has been defined in the cases, are entitled to the assistance of counsel, and the decisions mandate that for such assistance to pass constitutional muster, it must have been effective. U.S. Const., Amend. VI; Ala. Const., Art. I, § 6; Powell v. Alabama,287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Taylor v. State,291 Ala. 756, 287 So.2d 901 (1973), cert. denied, 416 U.S. 945,94 S.Ct. 1955, 40 L.Ed.2d 298 (1974). Consistent with this principle, the United States Supreme Court established in the decision of Glasser v. United States, 315 U.S. 60,62 S.Ct. 457, 86 L.Ed. 680 (1942), that, at least in the context of a situation where an attorney simultaneously represented two or more co-defendants to a criminal prosecution, the Sixth Amendment demanded that the attorney's loyalty to his client be undivided and unimpaired by competing or conflicting considerations or loyalties:
 "[We are] clear that the `Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to counsel means less than this, a valued constitutional safeguard is substantially impaired."
This constitutionally-prescribed prohibition against an attorney's representation of conflicting interests was further explored and defined in the Fifth Circuit decision of UnitedStates v. Alvarez, 580 F.2d 1251 (5th Cir. 1978), where that court had the occasion to note:
 "As the law has recognized for quite some time, though, the Sixth Amendment right to counsel implies much more than a minimum level of professional competence: even otherwise competent trial lawyers may sometimes find themselves in a position in which they are unable to render effective assistance of counsel. Thus, where defense counsel in a criminal trial represents one of several clients with conflicting interests, his effectiveness as a vigorous advocate for a particular defendant may be impaired by his commitment to other clients: [Effective representation] is lacking, however, if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents — as a vigorous advocate having the single aim of acquittal by all means fair and honorable — are hobbled or fettered or restrained by commitments to others. "Porter v. United States, 298 F.2d 461, 463 (5th Cir. 1962). Undivided loyalty and fidelity of commitment is therefore the guiding principle in this important area of Sixth Amendment jurisprudence . . . Although an accused is entitled to counsel free of conflicting obligations, not every conflict in representation will be so egregious as to constitute a violation of the Sixth Amendment . . . In other words, an actual, not merely hypothetical or speculative conflict must be demonstrated before it can be said that an accused has been deprived of effective assistance of counsel. . . ."
We read the above-quoted language as requiring the conclusion that, when it has been shown by the accused that his counsel was representing actual conflicting interests, *Page 1086 
the accused has been thus denied his Sixth Amendment right to the effective assistance of counsel as a matter of law. Appellant does, of course, contend that his trial counsel's representation of Vickers constituted an actual conflict of interest, and our examination of the Alabama decisions reveals that this precise set of circumstances is one of first impression in this State, although we have had occasion to consider the instance where an accused is prosecuted by his former defense counsel. See, Hannon v. State, 48 Ala. App. 613,266 So.2d 825 (1972); Satterwhite v. State, supra. We do find, however, that a number of cases from other jurisdictions have considered this issue in varying factual situations.
The courts of other jurisdictions have thus frequently reversed the convictions of criminal defendants where it was shown that a defendant's attorney was simultaneously
representing a prosecution witness in the same or some other matter on the rationale that such was an actual conflict of interest which would act to impair the attorney's abilities to adequately represent the criminal defendant as mandated by the Sixth Amendment. Stephens v. United States, 595 F.2d 1066 (5th Cir. 1979); Zuck v. Alabama, 588 F.2d 436 (5th Cir. 1979);United States v. Alvarez, supra; Castillo v. Estelle,504 F.2d 1243 (5th Cir. 1974); Porter v. United States, 298 F.2d 461
(5th Cir. 1962); United States ex rel. Williamson v. LaVallee,282 F. Supp. 968 (E.D.N.Y. 1968); United States ex rel. Millerv. Myers, 253 F. Supp. 55 (E.D.Pa. 1966); State v. Aguilar,87 N.M. 503, 536 P.2d 263 (1975); Commonwealth v. Geraway,364 Mass. 168, 301 N.E.2d 814 (1973); People v. Stovall, 40 Ill.2d 109, 239 N.E.2d 441 (1968). In Porter v. United States, supra, the defendant had attempted to show entrapment by a police officer who was later removed from the police force for his illegal activities, but the defendant's attorney was apparently also representing the officer in disciplinary proceedings at the time, and the officer was not examined. The Fifth Circuit reversed defendant's conviction, finding that a very real conflict of interest had manifested itself:
 "A lawyer, undertaking to represent an accused, finds that the best weapon to establish entrapment is to implicate another. Unfortunately, he cannot implicate such person because that person is also a client. Stated in these terms, it does not really matter whether [the officer] was, or was not, called as a witness, or whether, for that matter, as one analogous to a hostile witness in a civil proceeding, he could have been called. Nor is it important that [the officer], if called, may not have testified to things establishing petitioner's innocence."
Similarly, in Castillo v. Estelle, supra, the Fifth Circuit was confronted with a situation where a defendant's attorney was simultaneously representing the victim of the crime charged to the defendant in an unrelated civil matter. The court concluded that, as the victim could not be "a detached observer of the trial of the accused," likewise his attorney would be under restraint in his handling of the criminal case:
 "In a similar case, the court observed: `It takes no great understanding of human nature to realize that the individuals who have been burglarized might be less than happy and might go so far as to remove the attorney from their good graces if this defendant were acquitted or received a light sentence or were placed on probation.' United States [ex rel. Miller] v. Myers, E.D.Pa. 1966, 253 F. Supp. 55, 57 . . . In these circumstances, counsel is placed in the equivocal position of having to cross-examine his own client as an adverse witness. His zeal in defense of his client the accused is thus counterpoised against solicitude for his client the witness. The risk of such ambivalence is something that no attorney should accept and that no court should countenance, much less create."
This reasoning was followed in the later decision of Zuck v.Alabama, supra, where a defendant's attorney was simultaneously representing the prosecutor in another legal matter. The Fifth Circuit again reversed the defendant's conviction on Sixth *Page 1087 
Amendment conflict of interest grounds, despite the contentions by the State that the prosecutor was representing the people of the State and was thus not personally committed to the conviction of the accused:
 "The dual representation here created an actual conflict of interest. The prosecutor and the defense attorneys here were adversaries for the purpose of this trial. It is sufficient to establish a constitutional violation that the defense attorneys owed a duty to Zuck to endeavour to refute the prosecutor's arguments and to impeach his witnesses. This being so, the same concern which underlays Castillo [v. Estelle, supra] is also present here: the defense attorneys were subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense of Zuck and dispense with the services of their firm."
The court further reasoned that the motives of the attorneys were irrelevant, the right to the effective assistance of counsel being "so vital to a fair trial that courts are compelled to examine every potential infringement of that right with the most exacting scrutiny." Thus, the court concluded, "the mere existence of a temptation in the abstract is sufficient to preclude duality of representation."
United States v. Alvarez, supra, presented the situation where the defendant was one of a number of persons originally indicted for narcotics offenses, and all of whom were represented by a single attorney. Subsequently, pursuant to a plea bargaining agreement presumably engineered by the attorney, most of the defendants pleaded guilty and were sentenced to various terms of imprisonment, mitigated for their testimony against the remaining defendants. The defendant Alvarez's offered plea of guilty was refused by the trial court, and Alvarez was subsequently tried with the same attorney as trial counsel. Two of those who had earlier received their sentences testified against Alvarez at the trial, and were only superficially cross-examined by the attorney because of the possibility that evidence of the prior plea agreements would be introduced. The Fifth Circuit reversed Alvarez's conviction, finding that a "glaring" conflict of interest had existed, notwithstanding the fact that the witnesses had earlier been sentenced:
 "We do not undertake to decide whether or not, when [the attorney's] clients were bargaining for pleas of guilty or nolo contendere, he could vigorously and effectively represent each client, consistent with the interests of his other clients. At any rate, as soon as appellant's plea of guilty was rejected and it became apparent that [the witnesses] were to be called to testify against appellant, then [the attorney] was confronted with a glaring conflict of interest which pulled him in opposite directions. As witnesses for the government . . . in order to fulfill their obligations under the plea bargaining agreement, would be expected to give incriminating testimony against appellant. Even though both . . . had been sentenced prior to being called to testify, they would nonetheless be faced with contempt citations should they refuse to testify and the possibility of a perjury conviction if they elected to change their story at trial. The only course of action consistent with their best interests would be to give the most credible testimony possible implicating Alvarez . . . On the other hand, as attorney for defendant Alvarez, [the attorney's] single aim should have been the acquittal of his client by any fair and proper means . . . Even before the trial began, then, [the attorney] wore two different hats, having as his dual objective the irreconcilable task of at once bolstering and discrediting the testimony of [the witnesses]. . . ."
A similar situation was present in Stephens v. United States,supra, where two defendants had been indicted together for an offense, but one elected at an early point to plead guilty and turn government's witness in exchange for a possibly mitigated sentence. Both were, at one time, represented by the same attorney, though the attorney apparently then ceased his representation of Wells, the witness, in favor of *Page 1088 
the appellant. It further appeared that, though Wells had pleaded guilty, his sentencing had been deferred, making it "clear that the Government's recommendation of the promised concurrent sentences was dependent upon Wells's testifying in Stephens's trial." After the point of Wells's guilty plea, it was evident that the attorney had nothing further to do with him. The Fifth Circuit noted that:
 "The conflict is apparent: in his role as Wells's attorney, Asinof was obligated to protect Wells's interest and to avoid jeopardizing the plea agreement; as Stephens's attorney, Asinof's responsibility was to make Wells appear as badly as possible and to thereby discredit him and his testimony."
The court further felt it immaterial that Stephens's attorney had, in effect, abandoned witness Wells in order to represent Stephens at trial:
 "Here, the District Court found that Asinof cut off all communication with Wells after the plea agreement had been reached and conducted an extensive cross-examination of him. Alvarez itself [supra], however, rejected this distinction as immaterial . . . Moreover, this distinction goes more to prejudice than it does to the presence of an actual conflict. Here, Asinof owed conflicting duties to the defendant and a witness for the prosecution. That appearances indicate he ignored his duties to the witness in favor of those owed the defendant is irrelevant."
The Stephens decision was distinguished in the recent Seventh Circuit case of Theodore v. New Hampshire, 614 F.2d 817 (7th Cir. 1980). There, the appellant had been indicted and convicted for conspiracy to commit arson after an employee of his had been arrested while attempting to commit the arson. One attorney represented both men, and the employee pleaded guilty and was sentenced to a term of imprisonment. Upon completion of the term of imprisonment, the employee had been called to testify against the appellant on the latter's conspiracy charge. The District Court held that a conflict of interest had been present due to the attorney's representation of the employee as well as the appellant, and that a writ of habeascorpus should issue, which decision was reversed by the Seventh Circuit. That court was of the opinion that the appellant had not shown that an actual conflict existed "at the time of . . . trial," in that the attorney had "fully severed his relationship" with the employee, had been "paid in full in advance" of the employee's trial, and "the two had no dealings since the end of the case" involving the employee.
We find the above-cited cases to be quite instructive as to the situation presented here, although the State apparently argues that at least some of the cited decisions are "distinguishable." There is, perhaps, some merit to this contention in that, at least technically, appellant's trial counsel had withdrawn from his representation of Vickers upon learning of the arrest of appellant (R. 68-69). But, in accordance with our reading and understanding of the cases cited, our inquiry should not be totally affected by the technical niceties of when an attorney in such a situation has withdrawn or otherwise divorced himself from one client in favor of another, especially when the interests involved almost certainly compete. Our review of the record reveals to us that, as based upon the testimony at trial, the appellant's attorney had indeed represented Vickers on the two charges of selling phencyclidine, and at some point an agreement had been struck by which Vickers would work for law enforcement authorities as an informer in exchange for the recommendation of a mitigated sentence. Vickers had not been sentenced at the time of appellant's trial, and it is evident that any recommendations as to leniency were to be based upon what information, presumably as to narcotics offenses, Vickers could "produce" in his role as an informer. That Vickers was a principal figure in the subsequent arrest of appellant is undisputed, and certainly the underlying agreement with the authorities and Vickers's general role and motivations as an informer were proper and important sources of possible impeachment *Page 1089 
of Vickers as a witness against appellant. And, while the exact role of appellant's attorney in the negotiation of Vickers's agreement to cooperate with the authorities is somewhat unclear from the record, it is evident that he was Vickers's attorney until the time of appellant's arrest, which occurred well after the agreement had been struck. It thus appears clear to us that appellant's trial attorney could not very well seek to fully represent the appellant, when that representation would of necessity involve an attack upon the credibility of the chief witness, Vickers, especially where the attorney had had a role in negotiating the agreement by which Vickers would inform in exchange for a possibly mitigated sentence. Despite his formal withdrawal from Vickers's case, we fail to see how the attorney could avoid a conflict by seeking to attack the credibility and abilities of Vickers, whose future sentence depended upon the relative level of success in his informing operations. We are therefore definitely of the opinion that a very real conflict of interest was present here, and in accordance with the above authorities, the fact that appellant's counsel had withdrawn as Vickers's counsel would not, under these circumstances be the determining factor.
We are mindful of that line of decisions which confront this issue in the context of the prior representation of a prosecution witness by a defendant's attorney, and have examined a number of them. See, United States v. Jeffers,520 F.2d 1256 (7th Cir. 1975), cert. denied, 423 U.S. 1066,96 S.Ct. 805, 46 L.Ed.2d 656 (1976); United States v. Cochran,499 F.2d 380 (5th Cir. 1974); United States v. Donatelli,484 F.2d 505 (1st Cir. 1973); United States v. Alberti, 470 F.2d 878 (2d Cir. 1972), cert. denied, 411 U.S. 919, 93 S.Ct. 1557,36 L.Ed.2d 311, and sub nom. Depompeis v. United States,411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973); Crisp v. State,394 N.E.2d 115 (Ind. 1979); Commonwealth v. Biancone, 393 A.2d 1221
(Pa.Super. 1978); State v. Means, 268 N.W.2d 802 (S.D. 1978). Our reading of these decisions shows that in each of them, there was no demonstrable conflict shown, usually because there was no real nexus between the prior representation and the present defense of the criminal defendant. At least two decisions, however, ordered a remand for a hearing to determine if the prior representation would have conflicted with the criminal defense. See, Tucker v. United States, 235 F.2d 238
(9th Cir. 1956), and People v. Owens, 69 Ill. App.3d 599, 26 Ill. Dec. 546, 388 N.E.2d 170 (1979). We therefore find these cases distinguishable in that here we have found that a conflict does in fact exist.
The appellant has listed several instances in which the conflict of interest he has urged acted to prejudice his case, while the State attempts to refute these point by point. InCastillo v. Estelle, supra, the Fifth Circuit noted:
 "The appellant has alleged specific instances of prejudice resulting from the conflicting loyalties of his counsel. We need not inquire into those allegations. when there is a conflict of interest such as exists in this case, the prejudice may be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a cold record, capable perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, as it is here, a denial of the right to effective representation exists, without a showing of specific prejudice."
This is supported in several decisions of the United States Supreme Court, and it is thus not necessary that a defendant who has demonstrated an actual conflict of interest so as to affect his right to the effective assistance of counsel show specific instances of prejudice. Glasser v. United States,supra; Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708,64 L.Ed.2d 333 (1980).
Our conclusion that a conflict of interest did in fact exist is not to be taken as any type of condemnation of appellant's trial attorney for his actions before and during appellant's trial. We find from the record *Page 1090 
that that attorney asserted a vigorous defense for appellant, with searching cross-examinations and well-reasoned and timely objections. We likewise find that this attorney certainly displayed no improper motive in seeking to disengage himself from David Vickers and then commencing representation of appellant. Further, no objection appeared during the trial from any party involved, nor did the trial court pause to inquire as to any possible conflict of interest. We can only presume in such situations that an attorney was mindful of and adhered to those principles of professional responsibility relevant to this type of situation. See, Code of Professional Responsibility of the Alabama State Bar, Canon 5; American Bar Association Standards for Criminal Justice, Standards Relating to the Defense Function, § 3.5. We cannot blind ourselves, however, to the obvious fact that where as here an actual conflict of interest manifested itself, that such a conflict acted to deny the appellant one of the basic rights guaranteed to criminal defendants under our Constitution. Authorities cited.
The judgment below therefore is reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.
[1] Appellant is represented by different counsel on this appeal.