Larry (Hoss) McCoy Self was indicted in a two-count indictment for trafficking in cocaine, in violation of §20-2-80, Code of Alabama 1975, and for the unlawful possession of marijuana, in violation of § 20-2-70, Code of Alabama 1975. Jimmy Asher Clayton was indicted for trafficking in cocaine, in violation of § 20-2-80, Code of Alabama 1975. Self's and Clayton's cases were consolidated for trial. The jury found Self guilty on both counts of the indictment and found Clayton guilty of trafficking in cocaine. Self was sentenced to 31 years' imprisonment in the penitentiary and fined $250,000. Clayton was sentenced to 21 years' imprisonment in the penitentiary and fined $250,000.
On March 28, 1986, Harry Spence, an employee of the Drug Enforcement Administration (hereinafter DEA), received a call from Keith Krakowski in the Miami DEA office. After receiving this call, Spence went to the Anniston-Oxford Holiday Inn and met with officers from the Talladega County Sheriff's Department, the Anniston Police Department, the Alabama Bureau of Investigation and the DEA. The officers set up surveillance around Room 207, which was registered to Samuel Montanez. The officers were looking for two individuals and a green Kenworth tractor trailer truck "with a yellow and black sleeper that had a decal painted on the side of it of a gorilla riding a horse picking up a girl with Monvero Transport painted on the side of the door." At some point, Officers Mike Martin and Mike Hembre left the Holiday Inn and conducted an aerial search for the tractor trailer truck. When they flew over Self's farm, they saw the truck parked approximately 100 feet from Self's house. A search warrant on the truck was obtained and executed that afternoon.
When the officers arrived at Self's house to execute the search warrant, Clayton was at the farm, approximately 300 yards from the truck, feeding some horses. Self was in the hospital at the time.
The officers found the tractor and the trailer locked. An ax was used to remove the lock from the trailer. When the trailer was opened, the officers smelled the odor of marijuana. However, no marijuana was found inside the trailer. A "slim-jim" was used to open the tractor cab door. A lock to the storage compartment of the sleeper was removed. Inside the storage compartment, the officers found a white styrofoam cooler which contained a bag which read "Revel's Shoes for the Entire Family" and listed an address in Hialeah, Florida. This bag contained 963.9 grams of cocaine. The cocaine was 40% pure and was cut with boric acid.
Various personal papers bearing the name of Samuel Montanez were found inside the sleeper of the truck. Six latent fingerprints which matched the known fingerprints of Montanez were also found inside and on the truck.
The tractor was registered to Rolando Marcano (also known as Rolando Blanco and hereinafter referred to as Rolando *Page 1025 
Blanco) and the trailer was registered to Eleizer Echeverria (Rolando Blanco's mother). The address for both was listed as 15744 Southwest 303 Terrace, Leisure City, Florida.
This same day, a man (identified as Rolando Blanco) was seen leaving Room 207. Blanco got into a taxi cab and the police followed the cab to the Birmingham Airport. When the cab arrived at the airport, Blanco got out of the cab and went inside. A short while later, Blanco returned to the cab with a Maria Gomez. The police again followed the cab as it headed back towards Talladega on I-20. The cab was traveling at speeds up to 100 m.p.h. The officers stopped the cab near the Eastaboga exit on I-20. Blanco was arrested at the time. A container with cocaine in it and $899 in cash were removed from Blanco's pants pocket.
At approximately 11:00 p.m. on the night of March 28, Clayton was stopped by the police as he was coming up the driveway to Self's farm. Clayton told the police officers that he came out to the farm to see about the horses. Clayton appeared to be intoxicated and he was arrested for driving under the influence.
The next morning, a search warrant was obtained for Room 207. Samuel Montanez was arrested in this room. The police seized two bags of cocaine and $2370 from Room 207. The cocaine seized from Blanco and from Room 207 was also cut with boric acid. A set of keys was found inside a travel bag in Room 207. One of the keys fit the lock on the side of the tractor. A set of keys was seized from Montanez's belt. One of the keys on the belt fit the lock on the back of the trailer, one key fit the storage compartment in the sleeper where the cocaine was found, one key fit the driver's door to the tractor, and another key fit the ignition. Another set of keys was found in Montanez's front left pocket. One of those keys fit the passenger door, one key fit the ignition, and another key fit the storage compartment in the sleeper. The police also found a piece of paper entitled "ledger" in Room 207. Several names and numbers were written on the paper, including "Hoss Cartwright" and 831-5281, "Jimmy Clay" and 835-0646, and "R.B. Transport."
Carolyn Brooks, the general manager of the Holiday Inn in Oxford, testified that records show that Room 352 was registered to Samuel Montanez on February 10-11, 1986. A phone call to 835-0646 was made from this room on February 10. Room 403 was registered to Montanez on February 27-28, 1986. Room 207 was registered to Montanez on March 27-29, 1986 and the following calls were made from Room 207: (305) 558-9677, (800) 441-1414, 835-0646, 831-4410.
Karen Wren, an employee of South Central Bell, testified that the phone number 835-0646 was listed to Clayton and the phone number 831-5281 was listed to Self.
The police also conducted a search of Self's residence on the morning of March 29, 1986. No one was at the residence at the time of the search. Self was still in the hospital at the time. A bag of marijuana was found inside a pocket of a jacket located in the master bedroom closet. Two bags of marijuana seeds were found inside a pocket of another jacket in the closet. Self's fingerprints were found on the plastic bags. A pen with the words "R.B. and Son, Inc. Feed Supply, Hialeah, Florida" was found on the kitchen counter in Self's house. A hat pin with the words "R.B. and Son Quarter Horse Ranch" was found in a jewelry box in the master bedroom. No keys that fit the tractor trailer truck were found in Self's residence nor was there any evidence of cocaine found.
Teresa Bujeiro testified that she lived with Montanez in Hialeah, Florida, in the early part of 1986. She stated that she accompanied Montanez to the Oxford Holiday Inn in February of 1986. While there, Montanez made a phone call and then told Bujeiro to go into the bathroom. A few minutes later, two men came into the room. One of the men was named Hoss and the other man was named Jimmy. Bujeiro identified the appellants as those two men. Montanez gave the appellants some cocaine. The appellants left and returned with $47,000. Later that month, Bujeiro *Page 1026 
again accompanied Montanez to the Oxford Holiday Inn. The appellants came to their room again and Montanez introduced them to her. Montanez gave the appellants a kilo of cocaine and the appellants gave him a large amount of money.
In early April of 1986, Bujeiro received a call from Montanez. Bujeiro then called Self and told him that Montanez wanted $50,000 that Self owed him. Self stated that he owed Montanez only $27,000 but that he could not send that much money through Western Union. He told her that he would send $1000 by Western Union. On April 9, 1986, Bujeiro went to the Western Union office in Hileah, Florida, and signed a money order for $1000. Bujeiro kept the money that was wired from Self.
Bujeiro was granted "use immunity" for her testimony by Alabama authorities and by the federal authorities in Alabama. She was paid $10,000 for her cooperation with the DEA.
A copy of a money order sent from the Western Union office in Anniston from Larry Self to Teresa Bujeiro in Hialeah, Florida, on April 8, 1986, was introduced into evidence. A copy of a receipt for the payment of $1000 to Teresa Bujeiro at the Hialeah Western Union office on April 9, 1986, was also introduced into evidence.
Rolando Blanco and Samuel Montanez were both charged with and convicted for trafficking in cocaine with regard to the cocaine which was found in the tractor trailer truck. Their convictions were affirmed by this court in Blanco v. State, 515 So.2d 115
(Ala.Crim.App.), cert. denied, (Ala. 1987).
 I
Both appellants allege that the evidence was insufficient to sustain their trafficking convictions. Section 20-2-80, Code of Alabama 1975 provides:
 "Any person who knowingly sells, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, 28 grams or more of cocaine or of any mixture containing cocaine, described in section 20-2-25(1), is guilty of a felony, which felony shall be known as 'trafficking in cocaine.' "
Both of these appellants were charged with being in actual or constructive possession of the cocaine found in the tractor trailer truck. Three elements are necessary to establish possession of a controlled substance. These are: (1) actual or potential physical control, (2) intention to exercise dominion and (3) external manifestations of intent and control.Korreckt v. State, 507 So.2d 558 (Ala.Crim.App. 1986); Radkev. State, 52 Ala. App. 397, 293 So.2d 312 (1973), aff'd,292 Ala. 290, 293 So.2d 314 (1974).
Clearly, neither of these appellants was in actual possession of this cocaine. Thus, "[t]o establish constructive possession, the state must show that the accused had dominion and control of the illegal substance itself or of the premises on which the substance was found. Grubbs v. State, 462 So.2d 995
(Ala.Cr.App. 1984); Franklin v. State, 437 So.2d 609
(Ala.Cr.App. 1983)." Hamilton v. State, 496 So.2d 100, 103
(Ala.Crim.App.), cert. denied, (Ala. 1986). "Constructive possession may be determined by weighing facts tending to support a defendant's necessary control over the substances against facts which demonstrate a lack of dominion and control." Korreckt, 507 So.2d at 564 (quoting Crane v. State,401 So.2d 148, 149 (Ala.Crim.App.), cert. denied,401 So.2d 151 (Ala. 1981)).
In the case at bar, there is no evidence of any of the elements necessary to show possession by either appellant. The only fact which might possibly demonstrate appellant Self's dominion and control is that the truck was parked in his driveway on his farm. There is an inference of constructive possession when the controlled substance is found on premises owned or controlled by the accused. Donahoo v. State,505 So.2d 1067 (Ala.Crim.App. 1986). This inference cannot be made under these particular facts and circumstances because, although the truck was parked on property owned by the appellant, the cocaine was found in the truck, which was neither owned nor controlled by the appellant. *Page 1027 
The tractor was owned by Blanco. The trailer was owned by his mother. Personal papers belonging to Montanez were found in the tractor. Montanez's fingerprints were also found in and on the truck. Both the tractor and the trailer were locked at the time of the search. The cocaine was found in a locked compartment inside the sleeper which was also locked. The only keys to the various parts of the truck were found either on Montanez or in the room in which he was arrested. There is not even evidence that appellant Self knew the truck was parked at his farm since he was in the hospital at the time the search was conducted. The state failed to prove that appellant Self had control of or access to the truck or the cocaine.
Likewise, we do not find any evidence of appellant Clayton's possession of the truck or the cocaine found inside. While appellant Clayton obviously knew of the presence of the truck on Self's farm since he was working approximately 300 feet from the truck at the time it was searched, this fact does not prove or tend to prove that he had control or dominion over the truck. "Mere presence in [or near] a place where contraband is found is not equivalent to constructive possession." Cook v.State, 341 So.2d 183, 184 (Ala.Crim.App. 1976) (citations omitted). Clearly, appellant Clayton did not own the truck or the farm on which it was parked. While he may have had control and dominion of the farm at the time of the search because of his employment, there is absolutely no evidence that he had control over what vehicles were parked in his employer's driveway or that he had control or access to this particular vehicle or its contents. Thus, the state also failed to prove appellant Clayton's possession of the cocaine.
Furthermore, even had the state established that either appellant had constructive possession of the truck or the cocaine, this fact alone would be insufficient to sustain a conviction for trafficking in cocaine. Cook, Temple v. State,366 So.2d 740 (Ala.Crim.App. 1978). "Proof of knowledge by the accused of the presence of the controlled substance is an essential element to conviction for the offense of trafficking." Donahoo, 505 So.2d at 1070 (citations omitted). Knowledge may be proved by circumstantial evidence. Korreckt, and "[i]t may be proved by evidence of acts, or conduct of the accused, from which it may be fairly inferred that he knew of the existence of the contraband at the place where it was found." Donahoo, 505 So.2d at 1070 (citations omitted).
In Korreckt, the police conducted a search of the defendant's home and of a vehicle parked outside his residence. In the cab of the truck, the police found a bank bag containing a large amount of cash, some papers bearing the defendant's name, and .02 gram of marijuana. A set of scales was also found in the cab of the truck. In the bed of the truck, the police found a thermos bottle containing 3.5 ounces of cocaine inside a half-full sack of chicken feed. Although the defendant did not own the truck, the owner lent him the truck while his car was being repaired. The defendant claimed ownership of the articles in the cab but denied any knowledge of the cocaine in the bed of the truck. The defendant admitted he had used marijuana and cocaine in the past but denied having done so for a period of time. However, a straw containing cocaine residue was found on the defendant's person. Furthermore, cocaine was found in a fireplace insert inside the defendant's residence.
On appeal, this court found that the defendant had constructive possession of the truck due to his actual dominion and control of the truck, even though he did not have exclusive possession of the truck because he could not exclude the truck's owner. However, since the defendant did not have exclusive possession of the truck, an inference of knowledge of the cocaine in the bed of the truck could not be made without "some evidence that connects the defendant with the contraband that is found." Korreckt, 507 So.2d at 565.
Despite the evidence that the defendant had control of the truck and access to the bed of the truck, that marijuana was found in the cab of the truck among items belonging to the defendant, that the defendant *Page 1028 
was present when the search was conducted, that the defendant admitted having used cocaine in the past, and that cocaine was found inside the defendant's residence and on his person, this court held that there was "absolutely nothing which would provide a connection between appellant and the cocaine discovered in the truck, from which the jury could have reasonably inferred appellant's knowledge of the presence of the cocaine." Korreckt, 507 So.2d at 566.
The only facts which tend to connect these appellants to the cocaine found in the truck are even more tenuous than those present in Korreckt. Although marijuana was found during the search of appellant Self's residence, no evidence of cocaine was found. Neither one of these appellants owned or had access to the truck or the cocaine contained within. Although the truck was found parked in appellant Self's driveway, this is not enough to prove his knowledge under these particular circumstances. In Korreckt the truck was found parked outside the defendant's residence and he was present at the time of the search of the truck. In McCray v. State, 501 So.2d 532
(Ala.Crim.App. 1986), cert. denied, (Ala. 1987), marijuana was found inside an apartment rented by the defendant. This court found that the state failed to prove the defendant's knowledge of the presence of the contraband because the defendant had last been sighted at her apartment three days prior to the search and there was no evidence as to how long the contraband had been in her apartment.
In the case at bar, appellant Self was in the hospital at the time of the search of the truck and there was absolutely no evidence presented at trial that he knew that the truck was parked at his farm. Although appellant Clayton was present at the farm when the search was conducted, this is not enough to establish his knowledge of the cocaine contained within the truck. If "[t]he mere presence of an accused in an automobile containing drugs is not sufficient to establish that the accused had knowledge of their presence," Temple, 366 So.2d at 742, certainly appellant Clayton's presence 300 feet from the truck which was parked on a farm where he worked is not sufficient to prove his knowledge of the cocaine. If physical proximity to the drugs does not give rise to an inference that a defendant had knowledge of the drugs, Grubbs v. State,462 So.2d 995 (Ala.Crim.App. 1984), cert. denied, (Ala. 1985), then neither does relative proximity to the property in which the drugs are found.
While there was evidence that these appellants had purchased cocaine from Montanez in the past, this evidence was not enough to prove the appellants' knowledge of the cocaine found in the search of the truck. "Before a conviction can be obtainedthere must exist some affirmative link between the accused andthe illegal substance. Specifically, there must be sufficient evidence to prove beyond a reasonable doubt that the accused had dominion and control over the substance." Hamilton, 496 So.2d at 104 (citation omitted) (emphasis added). There was absolutely no evidence presented by the state which linked either appellant to the cocaine found in the locked compartment in the locked sleeper of the truck to which neither appellant had access. Thus, the appellants' convictions for trafficking in cocaine must be reversed and rendered. Temple.
 II
The appellant also contends that evidence of the marijuana seized from Self's house should have been suppressed because the search of the house was not based on probable cause. Although the affidavit on which the search warrant was based is contained in the record, the search warrant itself is not included in the record and, thus, we are unable to address this issue. Callens v. State, 471 So.2d 482 (Ala.Crim.App. 1984),cert. denied, (Ala. 1985); Hammins v. State, 439 So.2d 809
(Ala.Crim.App. 1983); Turner v. State, 380 So.2d 393
(Ala.Crim.App. 1980).
 III
The appellants assert that they were denied the effective assistance of counsel because their trial counsels' performances *Page 1029 
were adversely affected by several conflicts of interest. The first time this issue was raised was in the appellants' motion for new trial. Both of the appellants had retained new counsel before the motion for new trial. These attorneys also represent the appellants on appeal.
The following chart may be of assistance to the discussion of the evidence adduced at the hearing on the appellants' motion for new trial.
September 7, 1984 — Latham and Renee Korreckt[1] were arrested and charged with trafficking in cocaine and with the unlawful possession of a controlled substance.
September 11, 1984 — S.S. (appellant Self's attorney at trial) requested a preliminary hearing on behalf of the Korreckts.
October 31, 1984 — S.S. filed a notice of appearance on behalf of both Latham and Renee Korreckt.
February 8, 1985 — Latham and Renee Korreckt were indicted by the Talladega Grand Jury for trafficking in cocaine (Count I) and for the unlawful possession of a controlled substance (Counts II and III). Thereafter, S.S. filed a motion for continuance and a motion to suppress on behalf of the Korreckts.
May 15, 1985 — Latham Korreckt was convicted of all of the charges in the indictment following a trial at which he was represented by S.S.
June 17, 1985 — Latham Korreckt was sentenced (represented by S.S.).
July 16, 1985 — A motion was made by Renee Korreckt to add G.W. (appellant Clayton's attorney at trial) and John Medaris as her attorneys of record.
March 28-29, 1986 — The searches of the tractor trailer truck and appellant Self's residence were executed.
May 16, 1986 — Renee Korreckt pleaded guilty to Counts II and III of the indictment and was placed on probation (represented by G.W.).
June 1986 — Blanco and Montanez trial was held.
December 9, 1986 — This court reversed and rendered Latham Korreckt's convictions on Counts I and III of the indictment and remanded Count II to the trial court for resentencing (represented on appeal by S.S.).
June 26, 1987 — Self and Clayton were indicted on the charges which are the subject of this appeal.
November, 1987 — The appellants' trial was held (appellant Self was represented by S.S. and appellant Clayton was represented by G.W.).
December 9, 1987 — A hearing was conducted on Latham Korreckt's motion for release of funds which were exhibits in his trial (represented by S.S.).
At the hearing on the motion for new trial, G.W. testified that he represented appellant Clayton at trial. During the course of the trial, Mike Martin officially revealed that Renee Korreckt was his confidential informant with regard to the statement in the affidavit (supporting the search of the tractor trailer truck and appellant Self's house), "Within the past 72 hours, I have received information from a confidential and reliable source that Hoss Self is in possession of a quantity of cocaine."
Prior to this trial, G.W. had represented Renee Korreckt and her husband, Latham, in various matters. He had represented the Korreckts on some civil matters. After Latham's conviction, G.W. appeared with S.S. at a post-trial motion hearing in July of 1985. After Latham's imprisonment, G.W. contacted the Board of Corrections on Latham's behalf and requested that Latham be a candidate for the Supervised Intensive Release program. G.W. also assisted S.S. on a motion for release of funds which was filed in Latham's case. This motion was ruled on in December of 1987.
After Latham was convicted, Renee retained G.W. to represent her. S.S. had previously represented her. G.W. met with the sheriff and Mike Martin on at least two occasions during the plea bargain negotiations. *Page 1030 
Renee, represented by G.W., pleaded guilty to Counts II and III of the indictment and was placed on five years' probation. As a part of the plea bargain, Renee was to cooperate with the police in drug investigations.
In June of 1986, during the Blanco and Montanez trial, Renee contacted G.W. Renee told him that Mike Martin had called her and told her that he would assist Latham if she would help him with some testimony. The next day, G.W. placed a recording device on his home telephone and Renee came to his house and had a conversation with Martin on the phone. Based on what Renee told him, G.W. believed that what Martin alleged in the affidavit supporting the search warrants for the tractor trailer truck and Self's residence was untrue.
During a break in the Blanco and Montanez trial, G.W. had a conversation with Robert Rumsey, the District Attorney. G.W. asked Rumsey would a prosecutor, if he became aware of some evidence which contradicted an allegation of an affiant on a search warrant, be required to reveal this evidence underBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963). Rumsey replied that he did not want to talk about it then.
Later, G.W. told Rumsey that he had a tape which would prove that a police officer lied in the affidavit supporting a search warrant. Rumsey told G.W. that the person needed to make a complaint. G.W. believed that Renee would suffer if she made a complaint against Martin because Renee was still on probation at the time and Martin was her contact person.
G.W. never told either of the appellants that Renee Korreckt was the confidential informant in their case.
S.S. began representing the Korreckts after their arrest. He represented Latham at his trial, on appeal and in some post-conviction matters. S.S. represented Renee until Latham's conviction, when she retained G.W. as her attorney. After Latham's conviction and prior to his sentencing, S.S. spoke to the sheriff and Martin about assisting Latham if Latham could provide them with information which would lead to the arrest of Self. S.S. had another conversation with Martin concerning this matter. Latham was present on both occasions.
S.S. testified that he represented appellant Self at trial. S.S. also represented appellant Clayton in some pre-trial matters before Clayton retained G.W..
During the trial of Blanco and Montanez, S.S. heard that Martin said that his confidential informant told him that Self had been in possession of cocaine a few hours before the search of the truck. S.S. felt that it was possible that Martin had lied about what his informant had told him because Self went into the hospital on the morning the search of the truck was conducted.
S.S. heard that Renee might be the informant so he asked G.W. if he could talk to her. After he talked with Renee, he suspected that she was the informant in Self's case but he did not know for certain until the second day of Self's and Clayton's trial. However, when S.S. talked to Renee, she told him that she had not told Martin the things he said his confidential informant had told him. G.W. told S.S. that there was hypothetically a tape in existence which might prove Martin had lied in the affidavit.
S.S. did not believe he could call Renee as a witness in Self's trial. He did not think he could examine her because Renee was a former client and he knew things about her that he would not be able to question her about because he had gained that knowledge in a confidential manner.
Renee Korreckt testified that she and her husband, Latham, retained S.S. as their attorney after they were arrested on cocaine and possession charges in September of 1985. G.W. began representing Renee after Latham's trial. Renee pleaded guilty to the possession charges and was placed on five years' probation. In return for her plea, Renee was to cooperate with the police on other drug cases. On one occasion, Renee and Latham met with the district attorney and Martin. The purpose of this *Page 1031 
meeting was to obtain Renee's and Latham's assistance in arresting Self. At that meeting, G.W. told Renee to help the police catch Self by obtaining information about him. S.S. was also present on this occasion.
Renee testified that she provided Martin with information on one occasion and it was at least a week before March 28-29, 1986. She called Martin and told him she had been to Self's house and had seen several people who had associated with Latham. She wrote down the tag numbers and gave them to Martin. She did not see any drugs at Self's residence. She told Martin that a drug shipment might be in but she did not have any personal knowledge of such. Renee testified she did not talk to Martin within 72 hours of March 28, 1986 and did not tell Martin that he could find drugs at Self's house. Renee stated she never told Martin that Joe White had bought cocaine from Self.
During the Blanco and Montanez trial in June of 1986, Renee received a call from Martin. Martin asked her if she would do him a favor and act as an informer in a case. He said this would help Latham. Martin told her that all she had to do was to meet with the Judge and tell him that somebody who hangs around Self told her a shipment of drugs was in. Renee told Martin she would think about it and would let him know the next morning. Renee then contacted G.W. and they decided to make a tape of Renee's conversation with Martin the next morning.
The following is the transcript of the taped conversation between Martin and Renee.
 "SHERIFF"S DEPARTMENT EMPLOYEE: Sheriff's Department.
"MRS. KORRECKT: Yes. Mike Martin, please.
"MIKE MARTIN: Hello.
"KORRECKT: Mike?
"MARTIN: Yeah.
"KORRECKT: This is Renee.
"MARTIN: Hey, how are you doing?
 "KORRECKT: All right, I guess. I've thought about it. You want to explain to me what I'm supposed to tell Judge Fielding?
 "MARTIN: Just — he'll ask you did you give me any information, and you'll say, "Yes, sir." He'll more than likely say, "Well what did you tell him?" Then you tell him that, you know, that you've been working with me trying to help Latham, which you know, to be the truth. You know I don't want you to lie about nothing. Just say that you heard that they got a load in. That I asked you.
 "KORRECKT: Yeah, but it wasn't on the day of the (REMAINDER OF THIS INAUDIBLE)
 "MARTIN: No. Now it wasn't that day. It was just prior to that, you know.
"KORRECKT: I'm just kind of nervous about it.
"MARTIN: I understand.
 "KORRECKT: Cause, you know, I'm on probation and (REMAINDER OF THIS ANSWER INAUDIBLE) . . .
 "MARTIN: Well, don't worry about that. We're going to take care of you on that. Just tell it — to be honest with you, to be honest with you I don't remember. I couldn't tell you exactly what day it was. I didn't write no notes on it.
 "KORRECKT: It was before the Cubans (REMAINDER OF THIS ANSWER INAUDIBLE) . . .
 "MARTIN: Yeah, I believe it was. Maybe two or three days before. But I don't really know when — see, to be honest with you we don't know when the Cubans really got here. We don't know when they come in.
"KORRECKT: And it's going to help if I do this?
 "MARTIN: Oh, yeah — it'll help — (REMAINDER OF THIS ANSWER INAUDIBLE)
 "KORRECKT: Who's going to be there? Just me and the —
"MARTIN: Just Judge Fielding.
"KORRECKT: And you won't be there?
 "MARTIN: No. I mean I will if they want me to. I don't know, you know — far as I know right now it will just be you and the Judge. Judge — just tell him that it's through some of your — some of *Page 1032 
the people that you know that hangs around up there said that he got a shipment in, you know. And that's about all there was to it.
"KORRECKT: All right. Still at Julian's office?
 "MARTIN: Yeah. I tell you what. Stay at home for about thirty more minutes or longer cause it won't take you that long to get down here.
"KORRECKT: (ANSWER INAUDIBLE)
 "MARTIN: And when Robert gets here, we'll go talk to the Judge and see — I think Robert wants to set it about 9:30. That'll be the first thing we'll do.
"KORRECKT: (ANSWER INAUDIBLE)
 "MARTIN: You won't be down here ten minutes —
"KORRECKT: Okay.
"MARTIN: — once you get here.
"KORRECKT: Okay.
"MARTIN: All right.
"(PARTIES HANG UP)" (R. 1024-27).
Renee testified that she never told Martin the things he wanted her to tell the Judge. She stated she met with Judge Fielding and told him the truth.
Judge Fielding stated at the hearing that he remembers talking to Renee but did not write down the conversation. The purpose of the meeting was to determine if she was a material witness with regard to the Blanco and Montanez trial. Renee told Judge Fielding that someone had told her that they had seen cocaine at Self's house, but she had not seen any cocaine herself. Judge Fielding stated that Renee did not tell him that Martin told her to lie to him.
Harry Spence, the DEA agent, testified that he met with Rumsey and Martin on March 28, 1986 concerning the search warrant for the tractor trailer rig. Spence asked Martin if he had any information concerning Self. Martin said that he did not at that time but he would call someone. Martin then went and made a phone call.
Mike Givens, an assistant D.A. on March 28, 1986, assisted Martin in preparing the affidavit that he signed. Givens drew up the affidavit after Martin finished making a telephone call.
Mike Martin testified that he spoke to Renee about a week before March 28, 1986. He also stated that he called her on March 28 and asked her if she had "been over to Hoss' house in the last day or two" and she replied that she had not. He said, "Well the Cubans are here and their transfer truck is in his yard." Renee said, "Well if they are here, there is some cocaine there." Renee then told Martin that Joe White stopped by her house a day or two before and offered her a snort of cocaine. She said, that "when Joe White has got cocaine, he gets it from Hoss, and if Joe has got it, Hoss has got it." (R. 1096).
When Martin called Renee to come talk to Judge Fielding during the Blanco and Montanez trial, he told her that it would help Latham. Martin stated that he was present at the meeting when G.W. told Renee to do everything she could to help the police catch Self. He said that Renee cooperated with him to obtain Self's and Clayton's arrests. Martin admitted that he thought there may have been a conflict of interest in this case.
Robert Rumsey, the District Attorney, testified that he prosecuted Latham Korreckt during his trial. After Latham's conviction and prior to his sentencing, a meeting was held to see if anything could be done about Latham's sentence. During this meeting, a decision was made to allow Renee to plead guilty to possession charges.
On March 28, 1986, Rumsey met with Martin and Spence concerning the search warrant for the tractor trailer truck. Rumsey asked Martin if he had any information relative to Self or the tractor trailer truck. Martin told Rumsey he would check.
During the Blanco and Montanez trial, G.W. approached Rumsey during a break. G.W. asked him if it would be Brady material if he knew a police officer had falsely testified under oath. Rumsey replied that he thought it would be, and that was the end of the discussion. Later, G.W. came to his office and told him that he had a client who told him that a county deputy had testified to facts which were not true and G.W. wanted to put him on notice for a *Page 1033 
perjury investigation. Rumsey told G.W. that he would need corroboration and G.W. asked if a tape would make a difference. Rumsey replied that it would. He told G.W. that his client needed to make a complaint to the Alabama Bureau of Investigation. G.W. stated that he would check with his client but later told Rumsey that his client did not wish to pursue the matter.
During the trial of this case, Rumsey knew that S.S. had represented the Korreckts and Self. He also knew that G.W. had represented Renee and Clayton.
"In order to establish a violation of the Sixth Amendment [with regard to conflicts of interests], a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718,64 L.Ed.2d 333 (1980). A defendant who asserts a conflict of interest claim need not prove prejudice since prejudice is presumed if he "demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " Strickland v.Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067,80 L.Ed.2d 674 (1984) (quoting Cuyler 446 U.S. at 350, 348,100 S.Ct. at 1719, 1718).
There is some question as to whether the alleged conflicts in this case arose from simultaneous representation or successive representation. A defense lawyer's present or prior representation of another may give rise to an actual conflict of interest. However, it is usually more difficult to prove an actual conflict of interest in successive representation situations. Smith v. White, 815 F.2d 1401 (11th Cir. 1987). While a good argument can be made that this is a case of simultaneous representation, we will treat this situation as one of successive representation since we believe the result would be the same in either case.
Thus, we must initially determine whether any actual conflicts of interest were present in this case. An actual conflict of interest exists when an attorney owes loyalty to a client whose interests are adverse to another client. These interests are sufficiently adverse if it can be demonstrated that the attorney owes a duty to one client to do or refrain from doing something which could be detrimental to his other client. Schultz v. State, 481 So.2d 456 (Ala.Crim.App. 1985). "[A]ppellant[s] must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." Schultz, 481 So.2d at 459 (quotingBarham v. United States, 724 F.2d 1529, 1532 (11th Cir.), cert.denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984).
In Pinkerton v. State, 395 So.2d 1080 (Ala.Crim.App. 1980),cert. denied, 395 So.2d 1090 (Ala. 1981), a case strikingly similar to the one at bar, this court found an actual conflict of interest where the defendant's trial counsel had represented the informer in previous criminal proceedings. The following quote is this court's rendition of the facts relevant to this issue.
 "It appears that, at some time prior to appellant's arrest on the instant charge of selling cocaine, David Vickers and his wife had been arrested and charged with two counts of selling phencyclidine (PCP), and Vickers had retained the attorney that was to represent appellant (it is not clear whether this attorney also represented Vickers's spouse). During the course of this representation and apparently after some type of discussion with his attorney, Vickers decided to plead guilty to the charges and cooperate with the authorities as an informer in exchange for a recommendation of reduced sentences for himself and his wife. Vickers's subsequent activities as an informer led directly to the arrest of appellant, at which point Vickers's attorney withdrew as his counsel in order to represent appellant. It further appears that neither Vickers nor his wife had been sentenced at the time of appellant's trial, and that in some measure any recommendation as to their sentences was to be *Page 1034 
based upon the success of Vickers's informer activities."
Pinkerton, 395 So.2d at 1082.
In the case at bar, both appellant Self's trial attorney (S.S.) and appellant Clayton's trial attorney (G.W.) had represented the informant in this case (Renee) in previous criminal proceedings. While S.S. did not represent Renee during her plea negotiations, he did represent Renee's husband, Latham, at his trial and on appeal. During meetings with Rumsey and Martin prior to Renee's plea and prior to Latham's sentencing, G.W. urged Renee to assist the authorities in obtaining these appellants' arrest (which she obviously did) and S.S. urged Latham to do the same. It is clear that Renee was allowed to plead guilty to this offense in return for her cooperation in drug investigations involving these appellants. Furthermore, she was continually assured by the authorities that her cooperation would help Latham. It is obvious that G.W. and S.S. were aware of these facts.
It is also clear that G.W. and S.S. had a strong suspicion that Renee was the informant in this case prior to the time these appellants were indicted. It appears that G.W. and S.S. became aware that Renee was probably the informant in June of 1986 during the Blanco and Montanez trial. The appellants were not indicted and arrested until the summer of 1987. InPinkerton, the informant's attorney withdrew as his counsel upon Pinkerton's arrest. In contrast, neither G.W. nor S.S. declined representation of these appellants and G.W. continued to represent Renee and S.S. continued his representation of Latham.
As stated above, both G.W. and S.S. were strongly suspicious, if they did not actually know, that Renee was the alleged informant in this case. They also had reason to believe that Martin's allegations in his affidavit were untrue based on conversations with Renee. In fact, G.W. knew the substance of the taped conversation between Martin and Renee. S.S. "hypothetically" knew of the existence of this tape and the substance of it.
G.W. testified that he felt Renee would suffer if she made a complaint against Martin because she was on probation and Martin was her contact person. He obviously believed he could not call her as a witness for the same reasons. S.S. stated that he did not feel he could call Renee as a witness because he knew he could not question her regarding matters which he had learned in a confidential manner. Clearly, G.W.'s and S.S.'s loyalties to their former client, Renee, caused them to refrain from taking action which would have been helpful to these appellants but harmful to Renee. The conflicts of interest which existed in this case are even more blatant than the one which was present in the Pinkerton case. Thus, we find that G.W. and S.S. had actual conflicts of interest with regard to this case.
Furthermore, there is no doubt that these inconsistent interests adversely affected these appellants' attorneys' performances at trial. Renee's testimony at the hearing on the motion for new trial and the tape of her conversation with Martin certainly cast doubt upon the validity of Martin's allegations in his affidavit. Obviously, Renee's testimony, as well as the tape of her conversation with Martin, would have been exculpatory to these appellants. Rumsey admitted as much to G.W. when G.W. asked Rumsey the hypothetical question concerning the fact that an officer may have lied in an affidavit supporting a search warrant. There is no doubt that G.W.'s and S.S.'s failure to call Renee as a witness adversely affected their performances at these appellants' trial. We conclude that G.W. and S.S. "actively represented conflicting interests." Thus, these appellants were denied their Sixth Amendment right to the effective assistance of counsel.
There is no reason to address the issue of a waiver in this case because, although Self and Clayton were aware that their trial attorneys had previously represented the Korreckts, there is absolutely no evidence that either appellant waived his right to "conflict-free" counsel with full knowledge of all of the relevant facts.
As we stated in Section I of this opinion, the appellants' trafficking convictions are *Page 1035 
reversed and rendered. Our decision in Section III requires that appellant Self's conviction for possession of marijuana be reversed and remanded to the trial court for a retrial on this charge if the State so chooses. Due to our opinion in this case, we find it unnecessary to address the other issues raised on appeal.
REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.
MOTION GRANTED; OPINION CORRECTED; APPLICATION OVERRULED.
All the Judges concur.
[1] Latham Korreckt was the defendant in Korreckt v. State,507 So.2d 558 (Ala.Crim.App. 1986), which was discussed in Section I of this opinion.