804 So.2d 1122 (2000)
Gregory Renard WYNN
v.
STATE.
CR-98-2439.
Court of Criminal Appeals of Alabama.
October 6, 2000.
Opinion on Return to Remand December 1, 2000.
Rehearing Denied February 23, 2001.
*1124 Valerie Lynn Palmedo Goudie, Anniston; and Fred Lawton III, Anniston, for appellant.
Bill Pryor, atty. gen., and Thomas F. Parker IV, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Gregory Renard Wynn, was convicted of four counts of capital murder in connection with the killing of *1125 Denise Bliss. Two of the counts were made capital because the appellant committed the murder during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and two of the counts were made capital because the appellant committed the murder during the course of a second-degree burglary, see § 13A-5-40(a)(4), Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 12-0, that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal follows.[1]
In its sentencing order, the trial court summarized the relevant facts of this case as follows:
"The evidence and testimony in this case showed that Denise Bliss was a shift leader (manager) at a Hardee's restaurant located at 5630 McClellan Boulevard in Anniston, Calhoun County, Alabama. As a night shift manager, it was her duty to close the store and prepare the deposit of the cash receipts. Denise Bliss was employed and acting in that capacity for Hardee's on the evening of April 8, 1998. She was last seen alive after the store closed for business and she remained by herself to complete her duties as shift manager.
"Early on the morning of April 9, 1998, employees of the Hardee's store arrived to begin preparation of the restaurant and food for the service of the breakfast menu. Upon gaining entry to the store, blood was first noted in significant quantities on the floor and the employees left to summons help. Police were called and an investigation began.
"The evidence showed that Denise Bliss had worked at Hardee's for some thirteen or fourteen years and in her capacity as a shift leader or manager she had the authority to hire and fire employees under her. It was further testified to that the Defendant Gregory Renard Wynn had previously been employed at the Hardee's store which was the scene of the crime and that he had been terminated. Clearly, Denise Bliss and the Defendant knew and would recognize one another. While working at Hardee's and at the time of the crime, the Defendant lived at 6305 Meadowlark Drive, which address was less than a mile from the Hardee's store in issue.
"The evidence offered and unrebutted showed that Hardee's has a routine for the accounting of receipts and on-premises maintenance of operating cash. Essentially, each cash drawer contains assorted cash and currency amounting to $100, each drawer is sized to fit in the store safe where it is to be placed on closing, that some $700 is maintained in a `safe fund' [additional coins and currency for operations] and that the remaining money, when the drawers are `counted down' to $100 is deposited. The deposit is prepared, documented and then placed in a serial-numbered bag and an accounting strip containing that serial number is torn off and retained. Also, the serial number of a so-called `bait bill' is recorded, usually the highest denomination bill.
"From testimony and evidence it appeared that the routine followed above was followed and certified following close of business on April 8, 1998.
"The evidence further showed that Denise Bliss arrived at work at Hardee's at around 2:23 p.m. when she `clocked in.' That night on closing, her co-workers *1126 Anthony Gooden and Jennifer Wintle `clocked out' at 10:07 p.m. and 9:57 p.m., respectively. Thereafter, Denise Bliss was ostensibly alone in the store and was the apparent sole occupant of the premises with legal authority to enter or remain.
"A Hardee's employee, Gloria Foster, a biscuit cook, arrived at the store site around 3:00 a.m. and Ingrid Terry, a line cook, arrived shortly thereafter. Upon gaining access to the building, which was locked, they discovered blood on the floor and immediately left to call the police.
"When the police arrived, they found a large pool of blood on the floor and a trail of blood leading to the body of Denise Bliss in the store freezer or walk-in cooler. The store remained under the custody and control of the Anniston Police Department until it was processed as a crime scene.
"From the crime scene, it was evident that there had been a confrontation in the area of the store where the blood pool was located and that the body of the victim Bliss had been dragged to the freezer or cooler. It was also evident that the cash register drawers, the safe and the night deposit had been ransacked and money was missing. It was later determined that some $1100 in receipts [currency, checks and coins] were missing.
"The evidence further showed that the night of April 8, 1998, was stormy and that severe weather forecasts had been issued. Shortly before closing, it was further shown that two black males had come into the Hardee's store and asked to use the telephone. Additional evidence showed that both men left shortly thereafter.
"While the defense attempted to imply that one or both of these men may have been responsible, there was no credible evidence developed supporting that defense theory. In fact, the State called two witnesses, both of whom ... testified that sometime around 9:52 p.m. they saw a black male at or near the intersection of Weaver Road [very close to the Hardee's in issue] cross the road and walk toward the crime scene. One of the witnesses testified that he got a good look at the man as he crossed in front of his headlights and he then identified the Defendant as that person.
"The crime scene facts and evidence of the weapon or weapons used to inflict the injuries resulting in the victim's death [were] presented by Anniston police officers and crime scene technicians. While there was no direct evidence regarding the weapon or weapons used, the circumstantial evidence [from the testimony of these witnesses and other testimony regarding statements attributed to the Defendant and from the physical condition of the items] was conclusive that the victim's wounds were inflicted by a window washing device [most often referred to as a squeegee] and a metal pipe device that was used to compact the trash before it was removed from the store waste receptacles. Both of these items were on the store premises prior to the crime and would have been known to one who had worked there. Further, either or both of these devices would be readily capable of inflicting serious physical injury or causing death if used to strike or beat someone.
"Though there was no direct testimony given that the Defendant was in the Hardee's store on the night of April 8th, the circumstantial evidence was overwhelming not only that he was, in fact, there but that the Defendant was the *1127 sole actor involved in the death of Denise Bliss.
"Through the testimony of Randy Smith, Jr., it was stated that on the night of but before the time of the crime alleged, the Defendant called Smith [a friend] and solicited his help in `hitting a lick' at Hardee's. The solicitation was declined and Smith went on to testify that he saw the Defendant the next day, April 9th, at the house trailer home of Brandy Yott in Weaver, Alabama, that the Defendant was wearing new clothes and a new silver scorpion or crab necklace and that the Defendant told him that he went into the Hardee's store before closing and hid in the bathroom. Smith further testified that the Defendant stated that he robbed the place, that the victim recognized him, that she was the person who had fired him and that he hit her in the mouth and chased her around the store.
"The testimony of State's witness Brandy Lee Mancil showed that the Defendant had stated to her that he had robbed Hardee's and that the Defendant showed her money stated to have been obtained in the robbery. Mancil further testified that the Defendant stated that he had killed the victim (Bliss), that he had thrown some items in the woods and that he had put his clothing into a dumpster. Mancil also stated that the Defendant had in his possession a blue zip bank bag and that he related to her that he had hidden in the Hardee's bathroom and that he had beaten the lady there (Bliss), who he said was the lady who fired him, and that he had drug her into the freezer where she would freeze to death before anyone could find her. Mancil further testified that she and the Defendant left the trailer and took a cab to the Howard Johnson's motel in Oxford, Alabama, where they all rented a room in Brandi Yott's name. Mancil also testified that Cledus Ferrell and Carlos McCallum came to the room after being contacted. The manager of the Howard Johnson corroborated many of the key items of testimony of Yott and Mancil from business records.
"The State presented, through various witnesses, that the next day the Defendant went on a buying spree, purchasing various items of clothing for himself and others and also a scorpion necklace and ring for himself. These items were identified by witnesses and by store personnel who sold them. Again, the evidence was overwhelming that the Defendant was the person with the money and was paying for all or nearly all of everything purchased for himself and the witnesses who testified regarding the facts and circumstances surrounding the purchases.
"After leaving the Howard Johnson's motel, Mancil, Yott and the Defendant returned to Brandi Yott's trailer in Weaver. Testimony presented by the dispatcher and two drivers of Andy's Taxi Company, showed that at 11:20 p.m. on April 8th a black male passenger was picked up on Meadowlark Drive and carried to Cedar Springs Road (Brandi Yott's trailer), that at 1:30 [a.m.] on April 9th two white female passengers and one black male passenger were picked up at 702 Cedar Springs Road and transported to the Howard Johnson's in Oxford, Alabama, and that 11:10 a.m. on April 9th one black male and two white females were transported from the Howard Johnson's motel in Oxford back to 702 Cedar Springs Road. The Defendant was positively identified by the cab driver as the black male transported on the morning of April 9th from Oxford to Weaver.
"Cledus Ferrell and Carlos McCallum (a/k/a `Dump') gave testimony that supported *1128 each other and further verified the testimony of Yott and Mancil. Both testified that they responded to a page around 2:30 a.m. on April 9th and went to the Howard Johnson motel in Oxford where they met Yott, Mancil and the Defendant. They testified about the money being spent, the facts surrounding the spending spree led by the Defendant the next day at the Quintard Mall and the statements made by the Defendant. They both testified that the Defendant admitted to robbing Hardee's and beating Ms. Bliss. They stated that the Defendant told them that he hid in the bathroom and then came out and ultimately beat the victim with an iron pipe or metal pole, knocking her teeth and gums out and hitting her in the throat until she stopped breathing. The defendant then stated that he drug her into the cooler. Both verified that the Defendant showed no remorse and that he actually made up some rap lyrics, `I took the pipe. I beat the bitch to death.' Ferrell also testified that the Defendant wanted to be driven to Atlanta where he could get a `teardrop' tattoo to prove he had killed someone.
"Joseph Embry, M.D., a forensic pathologist and state medical examiner with the Alabama Department of Forensic Sciences, testified as to the manner and cause of death of the victim, Denise Bliss. His testimony was detailed and graphic and described what could be best described as the savage beating of the victim. Not only did Dr. Embry describe the severity of the beating, he indicated that many wounds on the victim were `defensive' type wounds indicating that she was conscious and attempting to protect herself, but he went on to state that there were 40 or more blows inflicted, that the victim lived at least 30 minutes thereafter and that her survival time was extended by the Defendant placing her in the cooler. Dr. Embry ultimately testified that the victim died of multiple blunt force trauma to the head and neck and that the manner of death was homicide.
"Other testimony relevant on the issue of the severity of the beating was supplied by photographs, blood spatter evidence and testimony to the effect that the victim could not be identified by physical facial features but was identified other ways, one of which was by fingerprints.
"Multiple other items of physical evidence also connected the Defendant to the crime scene and to the victim. These items also proved a taking of property the property alleged in the indictment as well as property belonging to the victim. Other items recovered not only connected the Defendant to the crime but also corroborated what had been testified to as statements made by the Defendant. The various items of physical evidence connecting the Defendant to the crime scene and the victim need not be itemized here, but the quantity, quality and sources of the evidence can best be said to be overwhelming.
"While the Defendant did not testify in the case, the defense was based on a theory that someone else committed the act. The primary thrust was that the two black males reported to have entered the store shortly before closing time were responsible. A great deal of emphasis was also placed on the physical attributes of a bloody shoe print documented at the crime scene.
"The defense counsel attempted to make it appear that the unidentified two black males referred to above were, in all likelihood, Cledus Ferrell and Carlos McCallum. While alluded to, there was no substantial evidence presented to support this theory. Further, the defense's *1129 attempt to connect the bloody footprint to a suspect or perpetrator other than the Defendant essentially failed.
"Many of the Defendant's friends and associates were, without question, of marginal character. In some cases their individual lack of positive character traits might well give rise to some inference of responsibility or culpability. However, the evidence and testimony in this case, including the testimony of those very friends and associates, dovetailed so well [in quality, quantity and believability] that one could not even begin to reasonably infer any connection with the crime itself.
"Based upon the evidence and testimony in this case and the reasonable inferences that can be drawn therefrom, considering the Defendant's presumption of innocence as a matter of evidence, considering the law as it applies to the facts of this case and understanding and applying the fundamental requirement that the State must prove the Defendant guilty beyond a reasonable doubt of each and every material allegation of the crime or crimes charged, and doing so in light and sober understanding that this is a capital case and due the utmost consideration and care, the court has previously found and does hereby again find that the Defendant has been proven guilty beyond a reasonable doubt of capital murder as charged in Counts 1, 2, 3 and 4 of the indictment and that the jury verdict so finding the Defendant guilty was properly returned by the jury."
(Final Order on Sentencing 3-12.) Although the appellant does not challenge the sufficiency of the evidence to support his convictions, we have reviewed the evidence, and we conclude that it is sufficient to support his convictions.
In his brief to this court, the appellant raises issues he did not raise at trial. Although the lack of an objection at trial will not bar review of an issue in a case in which the death penalty has been imposed, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A, Ala.R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 n. 14 (1982)).

I.
The appellant's first argument is that the prosecution violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he contends that the prosecution waited until shortly before the trial was scheduled to begin to reveal that there may have been samples of DNA from two different males on a pillowcase law enforcement officers had seized during a search of the appellant's residence and on a partially burned dollar bill a witness had turned over to law enforcement officers after he had seen the appellant burning it. At trial, the prosecution moved to prevent the defense's expert from being allowed to testify about testing she had performed because the defense *1130 had not made the results of that testing available to the prosecution. In response to that motion, the appellant argued that the prosecution had not timely turned over certain evidence to the defense. Therefore, we question whether the appellant preserved this argument for our review. Nevertheless, because this is a case in which the death penalty has been imposed, we must review this argument for plain error. See Rule 45A, Ala.R.App.P.
"To prove a Brady violation, a defendant must show that `"(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial."'" Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998) (quoting Johnson v. State, 612 So.2d 1288, 1293 (Ala.Crim.App.1992)).
"Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial. United States v. Gordon, 844 F.2d 1397 (9th Cir.1988); United States v. Shelton, 588 F.2d 1242 (9th Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979); Ex parte Raines, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983); McClain v. State, 473 So.2d 612 (Ala.Cr.App.1985). A delay in disclosing Brady material requires reversal only if `the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial.' United States v. Shelton, 588 F.2d at 1247 (quoting United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924, 96 S.Ct. 2634, 49 L.Ed.2d 379 (1976))."
Coral v. State, 628 So.2d 954, 979-80 (Ala. Crim.App.1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Finally, in the Brady context, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
During a hearing on the State's motion, the defense admitted that, shortly before the trial began, the prosecution had made the pillowcase and dollar bill available for testing by the defense expert. Thereafter, the defense expert conducted DNA tests on the items. As a result of that testing, the defense stated that it would not be calling its expert as a witness and admitted that the testing had shown that the evidence was "useless" to the defense. (R. 1508.) Therefore, even if the prosecution did not timely provide the evidence to the defense, the evidence was certainly not favorable to the appellant or material to the issues at trial. Accordingly, the appellant's argument is without merit.

II.
The appellant's second argument is that the trial court erroneously refused to allow one of his attorneys to withdraw due to an alleged conflict of interest regarding one of the State's witnesses. Shortly before the trial was scheduled to begin, one of the appellant's attorneys realized that, in a completely unrelated case, he was representing one of the witnesses the State had indicated it intended to call in this case. The attorney consulted the Alabama State Bar and was advised that, pursuant to Rules 1.6 and 1.7 of the Alabama Rules of Professional Conduct, he should withdraw from the appellant's case. After hearing arguments on the attorney's motion to withdraw, the trial court denied the motion. In addition, it ordered the *1131 appellant's attorney to consult his notes regarding his representation of the witness and to advise the court if he had obtained information during that representation that he could use to cross-examine the witness when he testified in the appellant's case. (R. 205.) The attorney did not subsequently advise the trial court that he had obtained any such information and, in fact, at the hearing on the motion for a new trial, he testified that he had not learned anything in his representation of the witness that he could use to cross-examine him. Furthermore, both the witness and the appellant waived any conflict of interest in this regard, and the appellant's other attorney cross-examined the witness during the trial. (R. 906-08.) Finally, at the hearing on the motion for a new trial, the attorney testified that he could not think of anything the appellant's other attorney should have asked the witness on cross-examination.
In his brief to this court, the appellant relies heavily on the Alabama State Bar's recommendation that his attorney should withdraw from the case. Rule 1.7(a), Ala. R.Prof.Cond., upon which the Alabama State Bar's recommendation was based, provides:
"A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
"(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
"(2) Each client consents after consultation."
(Emphasis added.) In this case, based on the attorney's representations, there is not any indication that the representation of the appellant was directly adverse to the witness. Also, both the appellant and the witness waived any conflict in this regard and consented to the continued representation after consultation. Finally, the appellant's attorney admitted that he had not learned anything in his representation of the witness that he could use to cross-examine him. Therefore, the appellant's reliance on Rule 1.7(a), Ala.R.Prof.Cond., is misplaced.
Furthermore, in Molton v. State, 651 So.2d 663, 667-70 (Ala.Crim.App.1994), we stated the following about alleged conflicts of interest:
"The appellant argues that he was denied his Sixth Amendment right to the assistance of conflict-free counsel because, during the pendency of the proceedings against him, his retained trial counsel represented the State's only eyewitness, Demetrius Wiley, in probation revocation proceedings and was successful in having Wiley's probation continued.
". . . .
"It is `a basic constitutional precept' that those prosecuted for criminal offenses have a right to the assistance of counsel during the proceedings. Pinkerton v. State, 395 So.2d 1080, 1085 (Ala. Cr.App.1980), cert. denied, 395 So.2d 1090 (Ala.1981). `Where a constitutional right to counsel exists, [the United States Supreme Court's] Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.' Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). `[T]he importance of ensuring that defense counsel is not subject to any conflict of interest which might dilute loyalty to the accused has been long and consistently recognized.' Douglas v. United States, 488 A.2d 121, 136 (D.C.App.1985). More than 45 years ago, the United States Supreme Court declared: `The right to counsel guaranteed *1132 by the Constitution contemplates the services of an attorney devoted solely to the interests of his client.' Von Moltke v. Gillies, 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948) (emphasis added). The right to conflict-free counsel applies whether counsel is appointed or retained. See Cuyler v. Sullivan, 446 U.S. 335, 343-45, 100 S.Ct. 1708, 1715-16, 64 L.Ed.2d 333 (1980).
"Just as there is no per se constitutional violation in `[r]equiring or permitting a single attorney to represent codefendants,' Holloway v. Arkansas, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978), `there is no per se rule prohibiting representation of the defendant by counsel who has previously represented a government witness,' United States v. Bowie, 892 F.2d 1494, 1502 (10th Cir.1990). However, where counsel who has previously represented a prosecution witness subsequently represents the defendant against whom the witness is to testify, the potential for a conflict of interests exists in `that defense counsel may not be able to effectively cross-examine the witness for fear of divulging privileged information.' Id. at 1501. This same concern, as well as other rather obvious concerns, arise when counsel simultaneously represents the defendant and a prosecution witness. See, e.g., Rosenwald v. United States, 898 F.2d 585, 587-88 (7th Cir.1990); Pinkerton v. State, 395 So.2d at 1086; People v. Wandell, 75 N.Y.2d 951, 555 N.Y.S.2d 686, 554 N.E.2d 1274, 1274-75 (1990). Whether counsel's representation of the witness occurs before or is simultaneous with the representation of the defendant, the `potential for conflict is great where there is a substantial relationship' between the two cases. United States v. Bowie, 892 F.2d at 1502.
"... `[I]n order to establish a violation of the Sixth Amendment, ... [a defendant] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' Cuyler v. Sullivan, 446 U.S. at 348, 100 S.Ct. at 1718. Accord Williams v. State, 574 So.2d 876, 878 (Ala.Cr.App.1990). To prove that an actual conflict adversely affected his counsel's performance, a defendant must make a factual showing `that his counsel actively represented conflicting interests,' Cuyler v. Sullivan, 446 U.S. at 350, 100 S.Ct. at 1719, `"and must demonstrate that the attorney `made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.'"' Barham v. United States, 724 F.2d 1529, 1532 (11th Cir.) (quoting United States v. Mers, 701 F.2d 1321, 1328 (11th Cir. 1983)), cert. denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984). Once a defendant makes a sufficient showing of an actual conflict that adversely affected counsel's performance, prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)i.e., `that, but for counsel's unprofessional errors, the result of the proceeding would have been different' is presumed. Strickland, 466 U.S. at 694, 692, 104 S.Ct. at 2068, 2067. See United States v. Winkle, 722 F.2d 605, 610 (10th Cir.1983); Williams v. State, 574 So.2d at 878.
"At the hearing on his motion for a new trial, the appellant established only that trial counsel Parsons represented State's witness Demetrius Wiley in probation revocation proceedings during the pendency of the appellant's case and that Parsons was successful in his representation of Wiley. There was no showing that Wiley's probation revocation hearing was in any way related to the *1133 appellant's case or `that counsel actually learned particular confidential information during [his] representation of [Wiley] that was relevant to the [appellant's] case.' Williams v. State, 574 So.2d at 878. Compare Pinkerton v. State, 395 So.2d at 1082 (defense counsel also represented informant who testified against defendant after helping make case against defendant `in exchange for a recommendation of reduced sentences for himself and his wife'; informant had not been sentenced at time of defendant's trial; and `in some measure any recommendation as to [informant's and wife's] sentences was to be based upon the success of [informant's] informer activities'). Nor was there any showing that trial counsel's cross-examination of Wiley was impaired in any manner.
"There is language in Pinkerton v. State, 395 So.2d at 1086, indicating that the simultaneous representation of the defendant and a prosecution witness, in and of itself, constitutes an actual conflict. See also People v. Wandell, 555 N.Y.S.2d 686, 554 N.E.2d at 1274-75. It is clear, however, that Pinkerton involved much more than a mere showing of simultaneous representation of the defendant and a prosecution witness: The witness testifying against the defendant had previously pleaded guilty to narcotics charges and, `in exchange for a recommendation of reduced sentences for himself and his wife,' had agreed to act as an informant and to assist the authorities in making drug cases against other persons. 395 So.2d at 1082. One of the drug cases the witness-informant assisted in making was the one against the defendant. The witness-informant had not been sentenced at the time of the defendant's trial and `in some measure, any recommendation as to [his and his wife's] sentences was to be based upon the success of [the witness-informant's] informer activities.' Id. That an actual conflict existed in Pinkerton was clearly demonstrated.

"Pinkerton did not cite Cuyler v. Sullivan, although it was released subsequent to Cuyler. Later federal cases relying on Cuyler have indicated that even defendants alleging a conflict of interest based on simultaneous representation of a prosecution witness must demonstrate an actual conflict through a showing of specific facts. See, e.g., Rosenwald v. United States, 898 F.2d at 587-88; Barham v. United States, 724 F.2d at 1531-33. We need not resolve this conflict in this case because, even assuming that the appellant has demonstrated an actual conflict of interest, he has clearly failed to show that that conflict adversely affected trial counsel's performance."
(Footnote omitted.)
In this case, there was not a substantial relationship between the appellant's case and the witness' case. In fact, the case involving the witness was a harassment prosecution that was not in any way related to the appellant's case. Also, there is no indication that the appellant's attorney actively represented conflicting interests and that he learned confidential information during his representation of the witness that would have been relevant to a cross-examination of the witness during the appellant's trial. Therefore, under the facts of this case, there was no conflict of interest, and the trial court properly denied defense counsel's motion to withdraw from representation of the appellant.

III.
The appellant's third argument is that "the trial court's demeanor and examination of witness Keyonda Brown so intimidate[d] and confuse[d] the witness as to render the fact finding nature of her voir *1134 dire examination ineffective, or worse so prosecutorial in nature as to render witness ineffective to defense." (Appellant's brief at p. 84.) However, he did not present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala.R.App.P.
Cledus Ferrell testified during the State's guilt-phase case-in-chief. Subsequently, during the defense's guilt-phase presentation of evidence, outside of the hearing of the jury, the following occurred:
"[DEFENSE COUNSEL]: We intend toalso would proffer that Mr. Ferrell overheard a conversation that Keyonda Brown was having with somebody else wherein she stated her suspicions that Mr. Ferrell was involved in this case. Mr. Ferrell overheard that and beat Ms. Brown, drug her into his car, beat her some more. Drug her to a secluded spot, put a gun inside of her, raped her, and then threatened to kill her. Maybe not in that order but those events happened after he heard that she suspected him in Ms. Bliss's murder.
"[PROSECUTOR]: Well, let me say this, Judge, that is not what Keyonda said as of two days ago. She never said that she was raped or a gun put inside of her except she says if that occurred it occurred prior to the murder itself, prior to anybody knowing what was happening at Hardee's. And basically what they're attempting to do there, Judge, is allow themselves to do what they wouldn't allow us to do when [the assistant district attorney] was trying to make a tacit admission thing. Now they want to say that she said something to him about being involved and he beat her up. That is not proper, Your Honor. It's remote. This happened, and I think the evidence would show, that this happened back inI believe it was JulyJune 23rd, which was some two and a half months after this incident occurred at Hardee's. It's remote. The evidence will not be that Cledus Ferrell said one thing to her about being involved in this murder or robbery; that she never thought that he was involved; that he never made any indication to her that he was involved in that; that she has no evidence that he was ever involved in the Hardee's incident. It's an attempt to show, again, bad character because he allegedly beat her up for some reason. And there is insufficient evidence to show that Cledus Ferrell is even a suspect or there's not enough evidence to indicate that he was even involved to allow this to occur. Under section 48, Judge, in McElroy's you can't just say, `I'm going to put on everything I've got against an individual, just my suspicion.' There is no evidence, no law, that allows you to massacre somebody's character just because you want to get it off your guy and put it on somebody else. There has got to be some distinct evidence indicating that that individual was involved in that and there is none in this particular case. And to allow this to come in through a witness who says that I said something or somebody else said something in front of Cledus and he beat me up, is to allow this jury to hear not just the fact that he allegedly beat her up but allow them to get in front of the jury that there isthat Cledus Ferrell, again, is a bad individual and therefore they ought to consider himwell, [defense counsel] shakes his head, yes, Judge. That's exactly what he's wanting to do. And that's improper and he knows that you cannot put character in front of this jury unless it is in fact something that they're to be looking at and it is not in this particular case.
"[DEFENSE COUNSEL]: Judge, under [Rule] 616, I think, Rules of Evidence, we get to show bias. And I think *1135 what that would show that he has an interest in the outcome of the case to point to where he'll do whatever it takes to keep anybody who had suspicions about him being involved in this murder from talking to witnesses, intimidation, threats of death, violence. I mean, my God, he heard this girl say, you know, `I think from what he said I think he's a little bit more involved in the case than he's letting on.' And he overheard that and he took that woman out and raped her and beat her and stuck a gun inside her. And if you don'tthat definitely has something to do with this case.
"[PROSECUTOR]: Judge, I would assert it doesn't.
"THE COURT: All right. Bring her in here, put her on the stand and have her testify to that if that's true.
"[DEFENSE COUNSEL]: Do you want her outside the jury?
"THE COURT: Well, bring her in if that is true and you can show. You know, jury's out. I'll give you all the leeway you need to show what you would present in front of that jury. But you're not going to put somebody up on that stand and engage in character assassination based on hearsay, innuendo, whatever unless you can substantiate it.
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: That would be patently wrong and you know it.
"[DEFENSE COUNSEL]: Let me call her in.
"THE COURT: What's your name?
"THE WITNESS: Keyonda Brown.
"THE COURT: All right, Ms. Brown. Speak up real loud, please, ma'am and answer [defense counsel's] questions if you would, please.
". . . .
"[DEFENSE COUNSEL]: Keyonda, at some point in '98, in 1998, were you involved with Cledus Ferrell?
"[THE WITNESS]: You mean relationship wise?
"[DEFENSE COUNSEL]: Uh-huh. (Affirmative.)
"[THE WITNESS]: Not going together, no. We weren'twe didn't have a relationship like that no more.
"[DEFENSE COUNSEL]: At that point you did not have a relationship like that?
"[THE WITNESS]: Other than the kids, no.
"[DEFENSE COUNSEL]: Okay.
"THE COURT: Speak up, please. I'm having trouble hearing you, okay.
"[DEFENSE COUNSEL]: Other than the kids, is that what you said?
"[THE WITNESS]: That's what I said.
"[DEFENSE COUNSEL]: You have two children with Cledus, is that correct?
"[THE WITNESS]: Yes.
"[DEFENSE COUNSEL]: Okay. I want to draw your attention to a time period in July of 1998; do you remember an incident occurring between you and Cledus?
"[THE WITNESS]: June of 1998.
"[DEFENSE COUNSEL]: Okay, in June of 1998. Can you tell the court what had occurred?
"[THE WITNESS]: You mean the whole thing or
"[DEFENSE COUNSEL]: The whole thing, Keyonda.
"[THE WITNESS]: Wewe was at Larry Love's in the parking lot. Everybody in mysome of my family, some of his family, cousins.

*1136 "[DEFENSE COUNSEL]: Was a person by the [name] of Starsky McCallum there?
"[THE WITNESS]: Yes.
"[DEFENSE COUNSEL]: Okay. Were you having a conversation with Starsky.
"[THE WITNESS]: Yes.
"[DEFENSE COUNSEL]: Did your conversation involve your suspicions of Mr. Ferrell being involved in
"[PROSECUTOR]: Judge, we're going to object to her leading her all the way down the path.
"THE COURT: Sustained.
"[THE WITNESS]: Well, we had a conversation.
"THE COURT: You can't lead her, okay.
"[DEFENSE COUNSEL]: All right.
"Did you have a conversation with Mr. Ferrell?
"[THE WITNESS]: Withyou said Cledus.
"[DEFENSE COUNSEL]: Excuse me. Did you have a conversation with Mr. McCallum?
"[THE WITNESS]: Yes.
"[DEFENSE COUNSEL]: Okay. What was your conversation about?
"[THE WITNESS]: It was just differences in Cledus not sayingI mean different things, different incidents, nothing big. Different incidents.
"[DEFENSE COUNSEL]: Okay. Such as?
"[THE WITNESS]: SnappingI mean not on everybody but just me. Things with me that happened between us in the couple of years before.
"[DEFENSE COUNSEL]: Okay. At that time did you discuss anything else?
"[THE WITNESS]: You mean the murder?
"[DEFENSE COUNSEL]: Yeah. Did you discuss the murder with Starsky McCallum?

"[THE WITNESS]: Not specifically. But just saying that things were different. Not saying anything about the murder, no.

"[DEFENSE COUNSEL]: Okay. Do you remember having a conversation with me about a week ago?

"[THE WITNESS]: Yes.

"[DEFENSE COUNSEL]: Do you remember telling me that in that conversation 
"[THE WITNESS]: Conversation.

"[DEFENSE COUNSEL]: you hadyou raised suspicions to Mr. McCallum?

"[THE WITNESS]: I mean, yeah. Me?

"[DEFENSE COUNSEL]: Uh-huh. (Affirmative.)

"[THE WITNESS]: Yeah.

"[DEFENSE COUNSEL]: Okay. Did Mr. Ferrell overhear that conversation?
"[THE WITNESS]: Yes.
"[PROSECUTOR]: We object.
"[THE WITNESS]: But okay.
"THE COURT: Ma'am, excuse me. No. This isn't funny.
"[THE WITNESS]: I'm sorry. But I mean everybody's
"THE COURT: No. You look at me. This isn't funny. Let's get the smile off our face, number one, okay. And let's answer the question truthfully, okay.
"[THE WITNESS]: Okay.
"THE COURT: All right. Now, there's an objection, sustained.
"[DEFENSE COUNSEL]: Was Mr.

*1137 "THE COURT: She doesn't know whether he heard her or not, okay.
"THE WITNESS: No. I said it was overheard.
"THE COURT: Excuse me.
"[DEFENSE COUNSEL]: Okay.
"THE WITNESS: I said
"THE COURT: Now, you quit running your mouth, you listen to the question, okay, and answer the question. Now, don't volunteer anything, please, ma'am.
"[DEFENSE COUNSEL]: What, if anything else, happened that evening?
"[THE WITNESS]: Well, later on I went to my aunt's house and Starsky dropped me off there and he left. And later on the incident withokay, DHR had reported of me being beat up by Cledus did happen, if that what you're asking. It did happen so.
"[DEFENSE COUNSEL]: Okay. What exactly happened?
"[THE WITNESS]: I was there. I was at 18 F Constantine
"THE COURT REPORTER: I'm sorry. I can't understand you.
"THE COURT: I can't understand a word you're saying, ma'am. Slow down, speak up, okay.
"[THE WITNESS]: I was at 18 F Constantine Apartments at my aunt's house going to the back door and Cledus was there after his cousin dropped me off. And then we fought right there for a minute. And after I got in the car with Cledus he took me to somewhere a dark road in Hobson City.

"[DEFENSE COUNSEL]: Okay. And then what happened?

"[THE WITNESS]: HeI don't know what the accusation was but something between me and Starsky. So he beat me, hit me and took me to his mother's house.

"[DEFENSE COUNSEL]: Is that it?
"[THE WITNESS]: Okay. Yeah.
"[DEFENSE COUNSEL]: Is that it?
"[THE WITNESS]: Uh-huh. (Affirmative.) Yeah.
"[DEFENSE COUNSEL]: I don't have anything further, Judge.
"THE COURT: [Prosecutor]?
"[PROSECUTOR]: I don't believe I have any, Judge.
"EXAMINATION BY THE COURT
"[THE COURT]: This was all over you having a relationship with Starsky?

"[THE WITNESS]: That's what he told me afterwards, yes.

"[THE COURT]: Had nothing to do with this case? It was over you having a relationship with another man?

"[THE WITNESS]: Well, it was really because I said something to him about me thinking that he might have, or why did he have clothes, and was he with him, asking did he not have anything to do with it. Me asking or thinking that Cledus may have had something to do with it.

"[THE COURT]: Make up your mind, okay.

"[THE WITNESS]: I mean that's point-blank maybe I did. I mean to him I don't know. But him thinking asking me
"[THE COURT]: But you don't know what he was thinking?

"[THE WITNESS]: I mean I already know the conversation after me and him had after that happened. That was it. Me thinkingwhy was I thinking that he might have had something to do with it so.

"[THE COURT]: The night this happened.

*1138 "[THE WITNESS]: Uh-huh. (Affirmative.)
"[THE COURT]: You said you went off to Hobson City because he was mad because you had a relationship going with this Starsky guy.

"[THE WITNESS]: Uh-huh. (Affirmative.)

"[THE COURT]: Isn't that what you just said?
"[THE WITNESS]: No. I was at Constantine when all this happened.
"[THE COURT]: I know where you were, ma'am.
"[THE WITNESS]: You mean he took me off when we wentwhen the incident happened.

"[THE COURT]: Yeah.

"[THE WITNESS]: Yes. I was in Hobson City, yes.

"[THE COURT]: And that had to do with you talking to another man down at Larry Love's?

"[THE WITNESS]: About the about the accusation of Cledus having anything to do with the murder, yes. That conversation was what was going on.

"[THE COURT]: I'm not sure I completelyI'm not sure I completely understand what you're saying, ma'am. What did he tell you when he beat you up, as you put it?

"[THE WITNESS]: What waswhy was mewhy was I with Starsky first. And hethe conversation we had was that why was hewhy, why? If he didn't have nothing to do with it why was hewhy he, you know, why was he with him? Why did he go spend money? That was the question. So therefore why was I asking questions about him and Greg being together?

"THE COURT: Okay. All right. Go ahead. Anything else?
"[DEFENSE COUNSEL]: I don't have anything else, Judge.
"THE COURT: [Prosecutor], anything else?
"[PROSECUTOR]: I've just got one thing.
". . . .
"[PROSECUTOR]: Did this incident involve in anyway somebody putting a gun inside of you?

"[THE WITNESS]: That's different occasions.

"[PROSECUTOR]: That was long before the murder, wasn't it?

"[THE WITNESS]: Excuse me.
"[PROSECUTOR]: That was long before the murder, wasn't it?

"[THE WITNESS]: Yes.

"[PROSECUTOR]: Okay. How about your getting raped, did you get raped out there?
"[THE WITNESS]: Everyyes.
"[PROSECUTOR]: That happened?
"[THE WITNESS]: Sexual intercourse did happen that night?
"[PROSECUTOR]: On this occasion?
"[THE WITNESS]: Yes.
"[PROSECUTOR]: And you're saying he raped you?
"[THE WITNESS]: Yes. If I was notyes.
"[PROSECUTOR]: If what?
"[THE WITNESS]: If Iyes, it did happen.
"THE COURT: No. He said `if what,' ma'am. Answer his question.
"[THE WITNESS]: I was sayingif I didn't, you know, didn't want to do it, you know, or I was already beat up, yes, it happened. Sexual intercourse did happen.
"[PROSECUTOR]: This was in June?

*1139 "[THE WITNESS]: June the 23rd if I may be exact.
"[PROSECUTOR]: But it wasn't anything about a gun that happened?

"[THE WITNESS]: Not this incident, no.

"[PROSECUTOR]: And Cledus Ferrell has never said one thing to you about ever being involved in that Hardee's incident, has he?

"[THE WITNESS]: Not saying he did it, no. He did not tell me that.

"[PROSECUTOR]: Okay. You don't have any evidence that he was involved in it, do you?
"[THE WITNESS]: No. Other than the things he told me which is not evidence. I don't consider it as being evidence. But what he told me the details or what happened that night, that's all I know.
"[PROSECUTOR]: Well, he basically told you that he got paged that night, didn't he?
"[THE WITNESS]: He told me that he got paged and he went to go pick up Greg from Weaver at a trailer park and they went and spent money. They went and gotthey went to a hotel.
"[PROSECUTOR]: But he wasn't supposed to have been there at Hardee's, was he? He didn't tell you anything about
"[THE WITNESS]: He didn't tell me that. No, he didn't.
"[PROSECUTOR]: Okay. That's all I have, Judge.
"EXAMINATION BY THE COURT
"[THE COURT]: Did he tell you anything other than the factyou know what he's testified to in this courtroom about what his involvement was and the whole
"[THE WITNESS]: No, I don't. I just heard about this last week. No, I do not.
"[THE COURT]: Did he tell you anything other than the fact that he got paged and that he went to the Holiday Inn?
"[THE WITNESS]: Other than them going
"[THE COURT]: And that he and some other people went over to the mall and Greg bought or supposedly bought some clothes for them?
"[THE WITNESS]: Other than about the lady's teeth or whatever it was just one little detail about that. He justhe told me that Greg told him how he did it.
"[THE COURT]: Okay. That's what I'm getting at. Has he told you anything about what happened at Hardee's that night other than what he says Greg told him?
"[THE WITNESS]: Not sayingno. He didn't tell me he did anything in that, no. He just saying well Greg told him, that's all.
"THE COURT: All right. Step down."
(R. 1596-1612.) The next day, the following occurred:
"[THE COURT]: Okay. Let me run throughwould you look at me and let me talk to you, okay? Would you answer my questions, ma'am?
"[THE WITNESS]: All right.
"[THE COURT]: Now, yesterday you related that back in June of 1998 you were down at Larry Love's Supper Club, is that right?

"[THE WITNESS]: Uh-huh. (Affirmative.)

"[THE COURT]: And you were having a conversation with some man and *1140 apparently, from what you said, and you correct me if I'm wrong, okay?

"[THE WITNESS]: Uh-huh. (Affirmative.)

"[THE COURT]: Mr. Ferrell, Cledus Ferrell, didn't like you talking to the other guy, is that right?

"[THE WITNESS]: Uh-huh. (Affirmative.)

"[THE COURT]: All right. Now, you also said y'all went out and that you had some problems. You also made a statement that he didn't like you questioning where he got clothes and money from, is that right?
"[THE WITNESS]: Uh-huh. (Affirmative.)
"[THE COURT]: All right. Now, when I asked you yesterday Mr. Ferrell had already testified in this case, okay. Do you know that?
"[THE WITNESS]: Huh-huh. (Negative.)
"[THE COURT]: All right. He's already testified in this case and he testified substantially that on the early morning hours of April the 9th that he got a page; that he did end up going down to the Holiday Inn and meeting some people down there and then the next morning went over to the mall and bought some clothes. Now, you were questioning him about some new clothes?
"[THE WITNESS]: Uh-huh. (Affirmative.)
"[THE COURT]: All right. At any time has Mr. Ferrell in anyway told you that he was involved in any manner with what happened out at Hardee's?
"[THE WITNESS]: Huh-huh. (Negative.) No. He just told me that it was just like a gift I guess.
"[THE COURT]: Like what?
"[THE WITNESS]: The clothes and stuff was just like a gift because he went and picked him up. He never said that he was there or that he had anything to do with it.
"[THE COURT]: He's never told you that he was in any way involved in that?
"[THE WITNESS]: Huh-huh. (Negative.)
"[THE COURT]: Did he tell you who bought the clothes for him?
"[THE WITNESS]: Greg.
"[THE COURT]: Okay. Well, that's substantially what he's testified to, okay. Now, you've made another statement or [defense counsel] I believe was asking you about an incident that occurred regarding a pistol.

"[THE WITNESS]: Uh-huh. (Affirmative.)

"[THE COURT]: And I think [the prosecutor] may have asked you or it was asked as to when that happened and that happened sometime well before all this other, is that not true?

"[THE WITNESS]: Before that incident June 23rd, yeah.

"[THE COURT]: Okay. And it happened before the April incident, before what happened out at Hardee's; didn't you say it happened a year before?
"[THE WITNESS]: I don't know about the year before, I'm not sure. But it happened before that.

"[THE COURT]: Okay. All right. Now, you and Mr. Ferrell have some children together, is that right?
"[THE WITNESS]: Uh-huh. (Affirmative.)
"[THE COURT]: Two?
"[THE WITNESS]: Uh-huh. (Affirmative.)
"[THE COURT]: Okay. And you've got noyou've got no evidenceyou've got nothing that you can point to that *1141 would show that Mr. Ferrell was involved in that Hardee's incident at all, is that true?

"[THE WITNESS]: Yeah, that's true. I don't have no evidence, no."

(R. 1628-31.) Subsequently, defense counsel stated:
"Regarding Ms. Brown, her testimony hasis substantially different from what we were led to believe it would be by her and based on what her testimony here today was I don't think that we can use that."
(R. 1632-33.)
"A trial judge may `pose questions to a witness for the purpose of clarifying the issues for the jury's consideration and to aid in the orderly conduct of the trial process.' Richardson v. State, 403 So.2d 297 (Ala.1981). `The trial judge has the right to propound such questions to witnesses as may be necessary to elicit certain facts, ...; and it not only is the court's prerogative to so act, but its duty, if the court deems it necessary to elicit proper evidence bearing on the issues.' Rice v. Hill, 278 Ala. 342, 343, 178 So.2d 168, 169 (1965) (citations omitted). `[W]ith certain exceptions, no rule of law exists which limits the power of a judge in a criminal trial to interrogate a witness during his examination. He may ask any question which either the state or the accused had the right to ask, but which has been omitted, if the answer may be relevant.' Holmes v. State, 22 Ala.App. 373, 115 So. 849 (1928). `The unquestioned province of the courtin fact, the solemn and sacred duty of a trial judgeis the development and establishment of the truth, and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other.' Brandes v. State, 17 Ala. App. 390, 391, 85 So. 824, 825 (1920)."
Timmons v. State, 487 So.2d 975, 981 (Ala. Crim.App.1986). See also Rule 19.2(b)(2), Ala. R.Crim. P.; Rule 614(b), Ala. R. Evid.
In Brantley v. State, 335 So.2d 189, 193 (Ala.Crim.App.), cert. denied, 335 So.2d 194 (Ala.1976), a similar case, we held:
"Appellant urges that in that part of the proceeding out of the presence of the jury ... the trial judge `acted improperly by suggesting to the witness that he had admitted perjuring himself by testifying inconsistently with testimony given during trial of a codefendant.' In pressing the point, appellant argues that when the court in making known to a witness what perjury is `extends it to browbeating, threats and intimidation, the Court has gone beyond the bounds of judicial authority.' Appellant relies largely upon Turner v. State, 289 Ala. 97, 265 So.2d 883, not upon what was held in that case, for action of the trial court was upheld, but upon what was said to the effect that when the remarks of the court constitute `browbeating, threats and intimidation' they go `beyond the bounds of judicial authority.' There can be no just quarrel with that conclusion. It may well be that the trial judge could and should have been milder in what he said to the witness. Certainly, `the trumpet' did not `give an uncertain sound.' Even so, we do not construe the language of the trial judge as `browbeating, threats and intimidation.' It was clear that the witness had made two irreconcilable statements in testimony. The trial court did not direct the witness toward either statement, but made it clear that the witness should be careful in finally stating which of the two *1142 statements was correct.... We find that no action then occurred that warrants a reversal of the judgment."
Likewise, in this case, because she had apparently made inconsistent statements to the prosecutor and defense counsel, the trial court properly questioned Keyonda Brown outside of the hearing of the jury to clarify what her proposed trial testimony would be and to determine whether that testimony would be admissible. See Rule 602, Ala. R. Evid. Although the trial court was firm with Brown, the record does not indicate that the trial court tried to intimidate or confuse her. Rather, it was simply trying to stress to Brown the importance of being consistent and truthful in her testimony. Furthermore, the trial court did not direct Brown's testimony toward a particular statement. Accordingly, we do not find any error, much less plain error, in the trial court's questioning of Brown.

IV.
The appellant's fourth argument is that "the trial court's failure to enforce its order granting [his] motion to have all sidebars and conferences outside of the jury recorded constitute[d] plain error." (Appellant's brief at p. 91.) He first complains about an unrecorded sidebar that took place during the direct examination of one of the State's witnesses. At that time, the following occurred:
"[PROSECUTOR]: Well, did he say anything about wanting to stay in town or to leave town?
"[WITNESS]: He said he had wanted to go to catch a ride to Georgia so he can get a tattoo, a teardrop.
"[DEFENSE COUNSEL]: Your Honor, I object. Sidebar.
"THE COURT: Just a minute, please.
"(Whereupon a sidebar conference was had outside the hearing of the jurors after which the following occurred).
"THE COURT: All right, ladies and gentlemen, I need to look at one piece of evidence out of your presence and it needs to be done on the record....
"(Whereupon the jury exited the courtroom after which the following occurred).
"THE COURT: All right for the purposes of the record, what occurred at the sidebar is simply a request by the defense that we look at the next portion of evidence out of the presence of the jury initially to give them an opportunity to argue an objection to it. We'll do that at this time. Go ahead."
(R. 1251-52.) Afterward, the trial court and the attorneys for the State and the defense discussed the admissibility of evidence that teardrop tattoos are gang-related symbols.
The appellant also complains about an unrecorded sidebar that took place immediately after the prosecutor completed his guilt-phase rebuttal closing argument. At that time, the following occurred:
"THE COURT: [Prosecutor], may I see you and [defense counsel] sidebar, please?
"[PROSECUTOR]: Yes, sir.
"(Whereupon a sidebar conference was had outside the hearing of the jurors after which the following occurred).
"THE COURT: Ladies and gentlemen, that concludes the closing arguments in this case. Again, take what you've heard, give it due consideration and weight but keep it separate and apart in your thinking from the evidence and testimony that you have heard in this case. *1143 "Now, my charge to you on the law, as I estimate at this point, will take somewhere around 35 maybe 40 minutes. Once I charge you and submit the case to you I will not want you leaving the building. So we're going to go ahead and let you break early for lunch. Because otherwise my charge would conclude right at the noon hour and the last thing I want you to feel is rushed for any reason. So I'm going to go ahead and let you recess for lunch. I will ask you if you would plan on being back here at 12:30 back up in the jury room. I will have you brought back down at that time and I will give you my charge on the law, okay."
(R. 1693-94.) Contrary to the appellant's argument in his brief to this court, the trial court did not orally charge the jury at that time. Rather, as it stated in its instructions to the jury, it released the jury for lunch and began its oral charge after the jury returned from lunch.
During the hearing on the appellant's motion for a new trial, the following occurred:
"[THE COURT]: This court has always strived to make sure that every issue in the case gets into the record. The so-called sidebars that you're talking about, some of those were requested by you?
"[TRIAL COUNSEL]: Yes, sir.
"[THE COURT]: And is it not true that they dealt essentially with administrative matters such as, `Judge, we're about to approach an area in which there is a motion in limine and you told us to let you know'? Matters such as, `Can we take a break before we start this?' And that any time a matter of substance was discussed it was either put on to the record directly by the court reporter or while the attorneys were standing here, the substance of what was discussed was put into the record with everyone's approval, is that not correct?
"[TRIAL COUNSEL]: I can't be 100 percent sure, Judge. But that was thethat's pretty standard for the way things ...
"[THE COURT]: Okay. Do you know any material matter that was discussed sidebar that was not made a part of the record?
"[TRIAL COUNSEL]: I can't recall any, Judge."
(R.1949-50.) Also, in its order denying the appellant's motion for a new trial, the trial court found:
"The issue of so-called `non-recorded sidebar conferences' was raised. Not only was no evidence presented that any `non-reported' sidebar contained any legal rulings or other similar matters, the court can affirmatively state that any sidebar conference held on request of the defense, the state or sua sponte that was not reported contained nothing of substance and only things dealing with administrative matters. Nothing adverse to the Defendant escaped being placed in the record to the court's knowledge, nothing has been so demonstrated to the court and the court can and does hereby state that it affirmatively and scrupulously protects the record to prevent any potential for detriment to the Defendant. At no time was it ever pointed out to the court that the procedure being followed, often at the request of the Defendant's own counsel, was not in keeping with the spirit and letter of the pretrial ruling in regard to this issue."
(C.R.213-14.)
Initially, we note that it should have been apparent to the defense during the trial that the court reporter was not recording *1144 certain sidebars. In fact, during the hearing on the appellant's motion for a new trial, trial counsel admitted, "I do recall sidebars without a court reporter taking down the transcript. At least not without my knowledge." (R.1944.) Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant.
Furthermore, in Ex parte Harris, 632 So.2d 543, 545-46 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), the Alabama Supreme Court addressed a similar situation as follows:
"In this case, the items or statements omitted from the record were not transcribed because they occurred out of the hearing of the court reporter. However, Harris's trial counsel had moved the trial court to `order the official court reporter to record and transcribe all proceedings in all phases [of the case], including pretrial hearings, legal arguments, voir dire and selection of the jury, in-chambers conferences, any discussions regarding jury instructions, and all matters during the trial and in support thereof ...'; and the court had granted the motion. After granting the motion, the court had the duty to see that the entire proceedings were transcribed; we must conclude that the failure to record and transcribe a portion of the voir dire examination of the jury and certain portions of the bench conferences, in light of the fact that Harris was represented on appeal by counsel other than the attorney at trial, constituted error. See Ex parte Godbolt, 546 So.2d 991 (Ala.1987). Thus, the question becomes whether that error constituted reversible error.
"`"When, [as in this case], a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal. The wisdom of this rule is apparent. When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. Indeed, counsel's obligation to the court alone would seem to compel him to initiate such disclosure. The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded. But when a defendant is represented on appeal by counsel not involved at trial [as in this case], counsel cannot reasonably be expected to show specific prejudice. To be sure, there may be some instances where it can readily be determined from the balance of the record whether an error has been made during the untranscribed portion of the proceedings. Often, however, even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish the irregularities that may have taken place would render illusory an appellant's right to [have the reviewing court] notice plain errors or defects....

*1145 "`"We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript. When ... a substantial and significant portion of the record is missing, and the appellant is represented on appeal by counsel not involved at trial, such a conclusion is foreclosed...."'

"Ex parte Godbolt, 546 So.2d at 997. (Citations omitted; emphasis added.) (Quoting with approval United States v. Selva, 559 F.2d 1303, 1305-06 (5th Cir. 1977)).
"We have carefully reread those portions of the record where each omission occurred and have reread the several pages before and the several pages after those omitted portions, to ascertain, if possible, the content and substance of the discussions not transcribed, so as to determine whether `a substantial and significant portion of the record' is missing and to determine whether we could `conclude affirmatively that no substantial rights of [Harris] have been adversely affected by the omissions from the transcript.' Id.

"From this extensive review, and given the particular facts of this case, we have concluded that the untranscribed portions of the proceedings did not constitute `a substantial and significant portion of the record' and we have `concluded affirmatively that no substantial rights of [Harris] have been adversely affected by the omissions from the transcript.' Rather, we have concluded that the trial court's rulings related to certain omitted portions of the proceedings were adverse to the state and that the content or substance of the other discussions that occurred out of the hearing of the court reporter was general in nature and had no effect on the outcome of the case. We conclude, under the facts of this case, that the error in failing to ensure that the entire proceedings were transcribed was harmless. Therefore, Harris's conviction was properly affirmed."
(Footnote omitted.)
Like the court in Harris, we have reviewed the above-cited portions of the record, as well as other instances in which sidebars were not recorded, and the pages of the record before and after the omitted portions to determine, if possible, the content and substance of the discussions that were not transcribed. Based on that review, we conclude that the unrecorded sidebars did not constitute "a substantial and significant portion of the record," and we have "conclude[d] affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript." A review of the portions of the record before and after the unrecorded sidebars clearly indicates that the unrecorded sidebars pertained to general, administrative matters, such as notifying the trial court that an objection needed to be made outside of the hearing of the jury and discussing the timing of breaks, that did not affect the outcome of the trial. In fact, on several occasions after an unrecorded sidebar occurred, the trial court stated for the record the substance of what occurred during the sidebar. In addition, the actual objections and discussions about the objections are included in the record on appeal. Therefore, under the facts of this case, we conclude that the error that resulted from the failure to record certain sidebars was harmless.

V.
The appellant's fifth argument is that, because he was seventeen years old *1146 at the time of the murder, "the imposition of the death sentence violates international law, from the International Covenant on Civil and Political Rights (`ICCPR'), December 19, 1966, 999 U.N.T.S. 175(2)." (Appellant's brief at p. 95.) The Alabama Supreme Court recently addressed and rejected a similar argument in Ex parte Pressley, 770 So.2d 143, 147-48 (Ala.2000), in which it stated:
"Pressley argues in his reply brief to this Court that the execution of a juvenile violates customary international law and international treaties ratified by the United States.1...
"Pressley, who was 16 years old when he committed the capital offenses, contends that the imposition of the death sentence on him violates international law. See International Covenant on Civil and Political Rights (ICCPR), Dec. 19, 1966, 999 U.N.T.S. 175.2
"The United States Senate ratified the ICCPR, with five reservations, five understandings, four declarations, and one proviso (`RUDs'). Reservation I(2) states:
"`The United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below 18 years of age.

"`. . . .
"`That the United States declares that the provisions of Articles 1 through 27 of the [ICCPR] are not self-executing.'3
"138 Cong.Rec. S4781-01, S4783-84 (daily ed. April 2, 1992) (emphasis added).
"Although the United States Senate ratified the ICCPR with a reservation that allows juvenile offenders to be sentenced to death, Pressley argues that this reservation is invalid because, he says, it is incompatible with the `object and purpose' of the treaty and is precluded by Article 4(2) of the ICCPR. See 138 Cong.Rec. S4781-01, S4783-84 (daily ed. April 2, 1992). Therefore, Pressley contends, his sentence of death is illegal.
"We are not persuaded that Pressley has established that the Senate's express reservation of this nation's right to impose a penalty of death on juvenile offenders, in ratifying the ICCPR, is illegal.4 Laws of other states authorizing the death penalty for criminal offenders under the age of 18 have withstood Constitutional scrutiny. See Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).
"In Stanford v. Kentucky, the United States Supreme Court rejected the argument that international law should influence rulings under the federal Constitution pertaining to the death penalty. In Stanford, Justice Scalia stated in a plurality opinion joined by Chief Justice Rehnquist and Justices White and Kennedy, that the execution of a defendant who was `16 or 17 years of age' at the time of the commission of a capital offense `does not offend the Eighth Amendment's prohibition against cruel and unusual punishment.' 492 U.S. at 380, 109 S.Ct. 2969. In a dissenting opinion, Justice Brennan, joined by Justices Marshall, Blackmun, and Stevens and relying on amicus briefs filed by such groups as Amnesty International, stated that `[w]ithin the world community, the imposition of the death penalty for juvenile crimes appears to be overwhelmingly disapproved.' 492 U.S. at 390, 109 S.Ct. 2969.

*1147 "In Stanford, Justice O'Connor wrote a concurring-in-part opinion explicitly distinguishing her views in Thompson v. Oklahoma, 487 U.S. 815, 857-58, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), from her views in Stanford:

"`Last Term, in Thompson v. Oklahoma (opinion concurring in judgment), I expressed the view that a criminal defendant who would have been tried as a juvenile under state law, but for the granting of a petition waiving juvenile court jurisdiction, may only be executed for a capital offense if the State's capital punishment statute specifies a minimum age at which the commission of a capital crime can lead to an offender's execution and the defendant had reached that minimum age at the time the crime was committed. As a threshold matter, I indicated that such specificity is not necessary to avoid constitutional problems if it is clear that no national consensus forbids the imposition of capital punishment for crimes committed at such an age. Id. [487 U.S.] at 857, 108 S.Ct. 2687. Applying this two-part standard in Thompson, I concluded that Oklahoma's imposition of a death sentence on an individual who was 15 years old at the time he committed a capital offense should be set aside. Applying the same standard today, I conclude that the death sentences for capital murder imposed by Missouri and Kentucky on petitioners Wilkins and Stanford respectively should not be set aside because it is sufficiently clear that no national consensus forbids the imposition of capital punishment on 16- or 17-year-old capital murderers.'

"Stanford, 492 U.S. at 380, 109 S.Ct. 2969 (citations omitted).
"Unlike the appellant in Thompson, who was 15 years old when he committed the capital offense, Pressley was 16 years old when he committed his capital offenses. Furthermore, Alabama's statutory scheme mandates that a person 16 years old charged with a capital offense be tried as an adult, and that scheme is similar to the statutory scheme that was in effect in Oklahoma when Thompson was decided. Because Pressley was 16 when he committed the capital offenses, we conclude that the death penalty was legally imposed upon him.5
1 "Article VI of the United States Constitution provides:
"`This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.'
2 "The United States ratified the ICCPR in 1992. Article 6(5) states:
"`Sentence of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women.'
"See also Convention on the Rights of the Child, Jan. 26, 1990, art. 37, 28 ILM 1448 (1989) (signed by the United States in 1996).
3 "A treaty is self-executing and creates an individual right of action when it expressly or impliedly creates that right. However, the United States Senate declared that the ICCPR was not self-executing, stating that the declaration was to `clarify that the Covenant will not create a private cause of action in U.S. Courts.' `International Covenant on Civil And Political Rights,' S. Exec. Rept., No. 102-23, 102d Congress, 2d Session, 15 (1992).
*1148 4 "Other international agreements cited by Pressley, such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N.G.A. Res. 39/46 (United Nations General Resolution), and International Convention in the Elimination of all Forms of Racial Discrimination, 660 U.N.T.S. 195 (United Nations Resolution), were ratified by the United States Senate with RUDs that specifically stated that international law does not prohibit the imposition of the death sentence on juveniles. See 136 Cong. Rec. S 17, 491-92 (1990); Louis Henkin, ed. Comment, U.S. Ratification of Human Rights Conventions: The Ghost of Senator Bricker, 89 Am.J.Int'l L. 341 (1995).
5 "In Ex parte Hart, supra, 612 So.2d at 537, we affirmed the Court of Criminal Appeals' conclusion that the imposition of the death penalty on a defendant who [was] 16 years old at the time of the crime is constitutional. See 612 So.2d at 535.
"Additionally, [the] United States Court of Appeals for the Fifth Circuit rejected the same argument in Celestine v. Butler, 823 F.2d 74 (5th Cir.), cert. denied, 483 U.S. 1036, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987):
"`How these issues are to be determined is settled under American constitutional law. Not a single argument is advanced directed at proving that the United States in these international agreements agreed to provide additional factors for decision or to modify the decisional factors required by the United States Constitution as interpreted by the Supreme Court. The argument is ingenious but content is wholly lacking.'
"823 F.2d at 79-80."
For the reasons stated in Pressley, the appellant's argument is without merit.

VI.
The appellant's sixth argument is that death by electrocution constitutes cruel and unusual punishment. During oral arguments, appellate counsel argued that this method of execution constitutes cruel and unusual punishment because it is used in only three states. However, courts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment. See Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Williams v. State, 627 So.2d 985 (Ala.Crim.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), rev'd on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Therefore, the appellant's argument is without merit.

VII.
We have reviewed the record for plain error, and we have found two errors that require a remand for further proceedings.

A.
First, we conclude that the appellant's convictions for two counts of robbery-murder and two counts of burglary-murder violate double-jeopardy principles. The appellant was charged, in a four-count indictment, with two counts of robbery-murder and two counts of burglary-murder in connection with the murder of Denise Bliss. Count I alleged that the appellant committed the robbery-murder "while [he] was armed with a deadly weapon or a dangerous instrument." (C.R. 19.) Count II alleged that, in the course of the robbery-murder, *1149 the appellant "caused serious physical injury to the said Denise Bliss." (C.R.19.)
"A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
"(1) Is armed with a deadly weapon or dangerous instrument; or

"(2) Causes serious physical injury to another."
§ 13A-8-41(a), Ala.Code 1975 (emphasis added).
"A person commits the crime of robbery in the third degree if in the course of committing a theft he:
"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
§ 13A-8-43(a), Ala.Code 1975. Clearly, Counts I and II were simply alternative methods of proving the single offense of robbery-murder. Similarly, Count III alleged that, while committing the burglary-murder, the appellant "did use or threaten the immediate use of a dangerous instrument," and Count IV alleged that, while committing the burglary-murder, the appellant "did cause physical injury to Denise Bliss." (C.R.20.)
"A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with explosives or a deadly weapon; or

"(2) Causes physical injury to any person who is not a participant in the crime; or

"(3) Uses or threatens the immediate use of a dangerous instrument."
§ 13A-7-5(a), Ala.Code 1975 (emphasis added). Again, Counts III and IV were simply alternative methods of proving the single offense of burglary-murder. We addressed a similar situation in Stewart v. State, 601 So.2d 491, 494-95 (Ala.Crim. App.1992), aff'd in part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999), and held:
"The six indictments show that the appellant was charged with four counts of intentional murder during the course of a burglary and with two counts of murder during the course of a kidnapping. In fact, the prosecutor alluded to the fact that the indictments were alternative ways of charging the appellant after the court's dialogue above. The four indictments charging murder during the course of a burglary merely detailed alternative ways of proving the elements of burglary. The two indictments charging murder during the course of a kidnapping alleged alternative methods of establishing the crime of kidnapping. We realize that `the purpose of the [alternative] counts was not to charge two or more separate offenses, but to vary the description of one and the same offense based upon one and the same transaction.' Floyd v. State, 486 So.2d 1309, 1313 (Ala.Cr.App.1984), aff'd, 486 So.2d 1321 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987). However, we do not have here a case like Floyd. In Floyd, the appellant was not convicted of all eight counts of capital murder but was convicted *1150 of only one count of capital murder. In the present case, the appellant was convicted on all six counts of capital murder. We do agree with the court in Floyd that the state would not have been required to elect which alternative counts under § 13A-5-40(a)(1) and § 13A-5-40(a)(4) would be presented to the jury. Alternative methods of proving the same crime `[do] not constitute separate offenses.' Ex parte State [Sisson v. State], 528 So.2d 1159, 1162 (Ala. 1988). However, the appellant's conviction on all six alternative counts cannot stand. Thus, according to Sisson, the convictions on three counts of murder during the course of a burglary and on one count of murder during the course of kidnapping must be vacated. A person cannot be convicted for the same crime twice because to do so would violate the principles of double jeopardy. Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). (For an in depth discussion applying the principles of Sisson and Blockburger to facts similar to those in this case, see Judge Bowen's special concurrence opinion in King v. State, 574 So.2d 921 (Ala.Cr. App., 1990).)"
For the reasons set forth in Stewart, the appellant's convictions on two alternative counts of robbery-murder and two alternative counts of burglary-murder cannot stand. However, one conviction for robbery-murder and one conviction for burglary-murder have been proven and may stand. Accordingly, we remand this case to the trial court with instructions that it vacate one of the appellant's convictions for robbery-murder and one of the appellant's convictions for burglary-murder.

B.
Second, the trial court's written sentencing order does not comply with the requirements of § 13A-5-47(d), Ala.Code 1975, which provides:
"Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
In its sentencing order, the trial court did not make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any additional mitigating circumstances offered pursuant to § 13A-5-52, Ala.Code 1975. Therefore, we remand this case with the additional instruction that the trial court enter a new sentencing order that complies with the requirements of § 13A-5-47(d), Ala.Code 1975.
On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 28 days after the release of this opinion.
REMANDED WITH INSTRUCTIONS.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.

On Return to Remand
BASCHAB, Judge.
The appellant, Gregory Renard Wynn, was convicted of four counts of capital *1151 murder and was sentenced to death on each conviction. On October 6, 2000, we remanded this case to the trial court with instructions that it vacate one of the appellant's convictions for robbery-murder and one of the appellant's convictions for burglary-murder and that it enter a new sentencing order that complies with the requirements of § 13A-5-47(d), Ala.Code 1975. See Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000). In accordance with our instructions, the trial court has submitted an amended sentencing order that substantially complies with § 13A-5-47(d), Ala.Code 1975. In that amended sentencing order, pursuant to our instructions, the trial court dismissed the appellant's convictions on Counts 2 and 4 of the indictment.
Pursuant to § 13A-5-53, Ala.Code 1975, we must now address the propriety of the appellant's convictions and sentences of death. The appellant was indicted for, and convicted of, two counts of capital murder because he murdered a person during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and because he murdered a person during the course of a second-degree burglary, see § 13A-5-40(a)(4), Ala.Code 1975.
The record does not reflect that the sentences of death were imposed as a result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. Specifically, it found that two aggravating circumstances existed: 1) the capital offenses were committed while the appellant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, a robbery or burglary, see § 13A-5-49(4), Ala.Code 1975, and 2) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found that two statutory mitigating circumstances existed: 1) the appellant did not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975, and 2) the appellant was seventeen years old at the time of the offenses, see § 13A-5-51(7), Ala.Code 1975. Finally, the trial court considered the following nonstatutory mitigating circumstances: 1) the appellant had a troubled childhood; 2) the appellant had an overly strict mother; 3) the appellant suffered physical and mental abuse; 4) the appellant experienced problems in school; and 5) the appellant's mental capacity (IQ) was called into question by the defense experts. The sentencing order shows that the trial court weighed the aggravating circumstances and the statutory and nonstatutory mitigating circumstances and correctly sentenced the appellant to death. Its decision is supported by the record, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's death sentences. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentences are appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentences are disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant killed the victim during the course of a robbery and a burglary. Similar crimes are being punished by death throughout this state. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997); Gaddy v. State, 698 So.2d 1100 (Ala.Crim. *1152 App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Land v. State, 678 So.2d 201 (Ala.Crim.App.1995), aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Bush v. State, 695 So.2d 70 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Payne v. State, 683 So.2d 440 (Ala.Crim.App.1995), aff'd, 683 So.2d 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997); Windsor v. State, 683 So.2d 1027 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Barbour v. State, 673 So.2d 461 (Ala.Crim.App. 1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Grayson v. State, 479 So.2d 69 (Ala.Crim.App.1984), aff'd, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). Accordingly, we conclude that the sentences are neither disproportionate nor excessive.
Finally, we have searched the record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App.P.
For the above-stated reasons, we affirm the appellant's convictions on Counts 1 and 3 of the indictment and the sentence of death as to each count.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.
NOTES
[1] This court heard oral arguments on September 19, 2000.